No. 2--07--0562          Filed: 11-18-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re MARRIAGE OF | ) | Appeal from the Circuit Court |
| ANGELINE HOLTHAUS, | ) | of Du Page County. |
| | ) | |
|     Petitioner and Counterrespondent- | ) | |
|     Appellant and Cross-Appellee, | ) | |
| | ) | |
| and | ) | Nos. 05--D--553 |
| | ) |      05--D--583 |
| NICHOLAS HOLTHAUS, | ) | |
| | ) | Honorable |
|     Respondent and Counterpetitioner- | ) | Rodney W. Equi, |
|     Appellee and Cross-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE ZENOFF delivered the opinion of the court:

On May 10, 2007, the circuit court of Du Page County entered a judgment dissolving the marriage between petitioner, Angeline Holthaus, and respondent, Nicholas Holthaus. Angeline appealed, arguing that the trial court erred in (1) striking her response to Nicholas's request to admit, (2) finding that she dissipated $118,688, and (3) failing to treat the parties' attorney fees as advances on their respective shares of the marital estate. Nicholas filed a cross-appeal, arguing that the trial court erred in finding that Angeline dissipated only $118,688. For the following reasons, we reverse and remand for further proceedings.

BACKGROUND

Angeline and Nicholas were married on June 21, 1961. They had two children during the

marriage, both of whom were emancipated by the time of trial.

During the course of the marriage, Angeline, who was in charge of the parties' finances, gambled at area casinos. Nicholas testified that she told him that the funds for the gambling came from the money she earned preparing tax returns for people and that, when he asked Angeline whether she had won or lost, she would tell him that she had broken even. Angeline testified that, when she went to the casinos, she would often spend "a few hundred dollars," which she obtained by cashing a check or withdrawing money from the ATM. According to her, she would "come away with money."

According to Nicholas, in 1997 the parties ceased having a "romantic relationship"[1] and in 1998 the parties ceased sharing a bedroom. Nicholas began to sleep in the rec room while Angeline slept upstairs in the master bedroom. Nicholas described the environment in the home at the time as hostile. In 2001, the parties were no longer sharing meals. Although Angeline would cook the meals or the parties would order food in, Nicholas would take his plate and eat in the rec room, away from Angeline.[2] Further, in 2001, the parties not only slept in separate parts of the house but also lived in separate parts of the house. Nicholas testified that the parties lived and ate separately because every conversation between them ended in an argument. Although there were

---

[1]Angeline testified at trial that she could not recall the last time that she and Nicholas had had "marital relations," but she admitted that during her deposition she testified that it was in the late 1990s.

[2]Angeline testified at trial that she and Nicholas did not stop eating meals together, but she admitted that during her deposition she testified that Nicholas would either take his meal to another room or eat quickly and then retreat to a separate room.

times he thought things might get better, they always became worse and there was eventually a point where the parties "just didn't communicate at all."

At trial, Nicholas described an incident that occurred in October 2001. After discovering two ATM withdrawals made at the Grand Victoria Casino in Elgin, totaling $6,000, he confronted Angeline. Her only response at the time was that she wanted a divorce. The following month, Angeline gave Nicholas a letter in which she outlined her "plan" for the future. She stated that she wanted the house and that she would be responsible for paying the equity loan if Nicholas did not want to contribute. In addition, she stated that she would be responsible for all credit card debt. She asked that Nicholas inform her of his plans for paying other household and car expenses and asked that, in any case, he continue paying such expenses until March 2002 so that she could get her "affairs in order." Angeline further stated in the letter that she and Nicholas could use the time "as a cooling off period or a settling of affairs period, whichever would apply," depending upon whether they chose to stay together or to separate. She concluded the letter by asking Nicholas to communicate with her in writing, "as communication [had] completely broken down between [them]."

After 2001, the parties together attended their son's wedding, made appearances at family events, and went out to dinner several times. In addition, Nicholas testified that he went to casinos with Angeline several times in order to help with Angeline's mother, who accompanied them.

Angeline's mother, Marie, lived with the parties for 16 years until she passed away in March 2006. While living with the parties, Marie owned a house in Chicago. In 2003, Angeline and Nicholas performed some repair and remodeling work on the house. Nicholas testified that he did much of the physical labor involved in repairing the house (the other portion of the physical labor

was performed by contractors), while Angeline mostly wrote the checks to cover the costs of the repairs. He also testified that the repairs and remodeling were paid for out of the parties' joint account. Nicholas testified that he and Angeline repaired Marie's house to prepare it for sale. Angeline testified that, although Nicholas did perform some of the work on Marie's home, he did not do so to the extent that he claimed. Instead, contractors did much of the physical labor. She also testified that the repairs and remodeling were paid for from the proceeds of an insurance claim Marie had made for hail damage to the house sometime after 2000 and that, at the time the insurance claim was made, the parties did not intend to sell the house. Angeline did admit, however, that the parties had twice attempted to sell Marie's home.

According to Nicholas, while Marie lived with him and Angeline, Marie did not have the assets to cover her living expenses and, in return for paying for Marie's living expenses, he believed he and Angeline would receive Marie's house. In the end, Marie's house did not sell, and Angeline inherited the house when Marie died. Angeline testified that there was never an agreement that Marie would give the house to Angeline and Nicholas.

In November 2004, Nicholas began to move some of his personal effects out of the marital home. Angeline testified that, as of January 2005, she was doing the cooking, cleaning, and shopping for the household. In February 2005, the parties got into an argument after which Nicholas left the marital home permanently. He returned several times in the weeks following his departure, to retrieve some of his personal items.

Nicholas testified that he believed "irreconcilable differences happened" as of October 2001. Angeline testified that she believed the marriage was "irretrievably broken"

as of February 2005, when Nicholas moved out of the marital home. When presented with her deposition transcript in which she stated that she believed the marriage was irreconcilably broken as of 1999 and that there was no hope for rehabilitation at that time, Angeline admitted that she had made those statements during the deposition. She also stated, however, that she did not remember being asked those questions and that she misunderstood the question regarding whether she believed there was hope to rehabilitate the marriage in 1999.

Angeline filed a petition for dissolution of the parties' marriage on March 10, 2005, in case number 05--D--553. Four days later, on March 14, 2005, Nicholas filed his own petition for dissolution of the marriage in case number 05--D--583. The trial court consolidated the two cases on April 13, 2005.

On March 24, 2006, Nicholas served Angeline with a request to admit facts, pursuant to Supreme Court Rule 216 (134 Ill. 2d R. 216), which was delivered to Angeline by Federal Express on March 27, 2006. The request asked Angeline to admit that she had withdrawn certain amounts of money for gambling purposes from various accounts held by the parties, as detailed in Exhibit A attached to the request to admit. Exhibit A was a copy of Nicholas's "Amended Notice of Intent to Claim Dissipation of Assets," which detailed all of the alleged withdrawals from the parties' various accounts. Angeline served her answer to Nicholas's request to admit facts on April 26, 2006. Nicholas subsequently filed a motion to strike Angeline's answer, arguing that the answer was served two days after the 28-day deadline provided for in Rule 216(c) and that Angeline thus should be deemed to have

admitted all of the facts contained in the request. The trial court granted Nicholas's motion to strike on June 5, 2006.

Following trial, on April 24, 2007, the trial court issued a letter order announcing its decision on the issues presented at trial. The letter stated, in relevant part:

"Elemental to the disposition of this case is the issue of dissipation, the date on which the marriage was irretrievably broken, and the validity of a request to admit facts that Ms. Holthaus failed to timely answer. First, the court concludes that the request to admit is indeed valid; while some of the facts sought may be characterized as 'ultimate facts' such facts are appropriately the subject of a request to admit.

Next, the court fixes the date of irretrievable breakdown as February[] 2005, the date of physical separation. It may be true that the irretrievable breakdown need not be the date of physical separation or filing. Yet whenever dissipation is claimed the court hears mostly self-serving testimony about how the relationship had deteriorated years in advance. A more objective determinant, though not required, is certainly helpful. Here, for instance, despite Mr. Holthaus's testimony concerning the irretrievable breakdown occurring in 2001, he and Ms. Holthaus worked together (actually he says he did the work) to remodel/repair her mother's house well into 2003. So when was the breakdown? There was no testimony of any 'triggering' event after the 2003 joint effort to repair Ms. Holthaus's mother's house. Under the circumstances February 2005 is the date that the marriage was

irretrievably broken. Therefore the amount of dissipation set forth in the Request to Admit Facts (and coincidentally supported) is $118,688.00.

*** Next the court skews the division [of the marital estate] again to offset the substantial attorney's fees incurred by Mr. Holthaus as a result of 1) the tracing necessary to establish the amounts dissipated[,] 2) Ms. Holthaus's failure to be forthcoming with discovery, and 3) the two aborted trial commencements attributable to Ms. Holthaus and her counsel. Although no specific dollar amount of those fees is set, the court considered the above factors in the division of property, and subject to this division each party is responsible for his or her attorney's fees."

The trial court entered a judgment of dissolution on May 10, 2007. The judgment stated that the trial court found that Angeline had dissipated $118,688, and the trial court "allocated" that amount to her in its distribution of the marital estate. Angeline timely appealed, and Nicholas filed a timely cross-appeal.

## ANALYSIS

On appeal, Angeline argues that the trial court erred in (1) striking her response to Nicholas's request to admit, (2) finding that she dissipated $118,688, and (3) failing to treat the parties' attorney fees as advances on their respective shares of the marital estate. In his cross-appeal, Nicholas argues that the trial court erred in finding that Angeline dissipated only $118,688. We address each of these issues in turn.

### A. Request to Admit

In her opening brief, Angeline argues that the trial court erred in refusing to allow her late response to Nicholas's request to admit, and thus in striking the response, because there was no

demonstrable prejudice to Nicholas as a result of Angeline's late response. Nicholas argues that the trial court properly struck Angeline's response because the mere absence of prejudice is not a basis for allowing a late response to a request to admit. Rather, according to Nicholas, Angeline was required to show good cause for allowing her late response. Angeline acknowledges in her reply brief that the case law supports Nicholas's position, and we agree.

Under Supreme Court Rule 216(a), a party may serve on the opposing party a request that the opposing party admit the truth of specific facts contained in the request. 134 Ill. 2d R. 216(a). Rule 216(c) provides:

"Each of the matters of fact *** of which admission is requested is admitted unless, within 28 days after service thereof, the party to whom the request is directed serves upon the party requesting the admission either (1) a sworn statement denying specifically the matters of which admission is requested or setting forth in detail the reasons why he cannot truthfully admit or deny those matters or (2) written objections on the ground that some or all of the requested admissions are privileged or irrelevant or that the request is otherwise improper in whole or in part." 134 Ill. 2d R. 216(c).

Pursuant to Supreme Court Rule 183, a trial court is permitted to extend the time for responding to a request to admit, "for good cause shown." 134 Ill. 2d R. 183; Bright v. Dicke, 166 Ill. 2d 204, 208 (1995). "Although Rule 183 does give judges discretion to allow responses [to requests to admit] to be served beyond the 28-day time limit, that discretion does not come into play under the rule unless the responding party can first show good cause for the extension." Bright, 166 Ill. 2d at 209. The absence of prejudice alone is insufficient to establish good cause under Rule 183.

Bright, 166 Ill. 2d at 209. Whether good cause exists is fact-dependent and rests within the sound discretion of the trial court; thus, the trial court's determination will not be disturbed absent an abuse of discretion. Vision Point of Sale, Inc. v. Haas, 226 Ill. 2d 334, 353-54 (2007).

In her response to Nicholas's motion to strike her response to his request to admit, Angeline did not contend that she had good cause for the delay in responding to the request to admit. We are unable to ascertain whether she made such a contention during the hearing on Nicholas's motion to strike, as the transcript from the hearing was not included in the record on appeal. See Foutch v. O'Bryant, 99 Ill. 2d 389, 391-92 (1984) ("[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant"). Most importantly, however, Angeline does not argue on appeal that she demonstrated good cause. Thus, we cannot say that the trial court abused its discretion. See Bright, 166 Ill. 2d at 209 (finding proper the trial court's order denying the defendant an extension to respond to the plaintiff's request to admit, where the defendant failed to show good cause).

## B. Dissipation

Both Angeline and Nicholas argue that the trial court erred in finding that Angeline dissipated $118,688. Angeline contends that the trial court erroneously included $86,000 that Angeline withdrew before February 2005, which the trial court determined was the

date of the irretrievable breakdown of the parties' marriage. Nicholas, on the other hand, contends that the trial court erred in calculating the dissipation only as of February 2005. We agree with Nicholas.

Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) lists the relevant factors a trial court should consider in determining how to distribute marital property in a dissolution proceeding. 750 ILCS 5/503(d) (West 2006). Included in the factors is "the dissipation by each party of the marital or non-marital property." 750 ILCS 5/503(d)(2) (West 2006). Dissipation is the " 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " In re Marriage of O'Neill, 138 Ill. 2d 487, 497 (1990), quoting In re Marriage of Petrovich, 154 Ill. App. 3d 881, 886 (1987). Whether dissipation has occurred is a question of fact to be determined by the trial court, and such a determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. In re Marriage of Vancura, 356 Ill. App. 3d 200, 204 (2005) (clarifying that the standard of review for a dissipation determination is the manifest-weight-of-the-evidence standard, not the oft-cited abuse-of-discretion standard). "A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." Samour, Inc. v. Board of Election Commissioners, 224 Ill. 2d 530, 544 (2007).

Before addressing the trial court's finding, we first note that Angeline argues that dissipation applies to improper expenditures that are made only after the marriage has undergone an irreconcilable breakdown. In support of this position, Angeline relies on

-10-

three cases: In re Marriage of DeLarco, 313 Ill. App. 3d 107 (2000), In re Marriage of Toole, 273 Ill. App. 3d 607 (1995), and O'Neill, 138 Ill. 2d 487. In DeLarco, the appellate court, citing Toole, stated that dissipation "applies to allegedly improper expenditures of marital funds for purposes unrelated to the marriage, at a time after the marriage has irretrievably or irreconcilably broken down." (Emphasis added.) DeLarco, 313 Ill. App. 3d at 112. In Toole, the appellate court had defined it the same way, relying on the supreme court case of O'Neill. Toole, 273 Ill. App. 3d at 615. The court in Toole, however, applied the holding in O'Neill to a situation where, at the time of the alleged dissipation, the marriage had undergone an irreconcilable breakdown as established by the parties' separation. As noted, in O'Neill, the supreme court held that dissipation is the " 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown' " (emphasis added) (O'Neill, 138 Ill. 2d at 497, quoting Petrovich, 154 Ill. App. 3d at 886), not after the marriage is irreconcilably broken.

The cases of Toole and DeLarco are distinguishable from the present case. In Toole, the dissipation occurred when the marriage had irreconcilably broken down, rather than when the marriage was in the process of irreconcilably breaking down. The court in Toole merely applied the definition contained in O'Neill to include within its coverage the period from the beginning of the breakdown of the marriage through the entry of the final judgment. Additionally, Angeline's citation to DeLarco references dicta. There, the appellate court held simply that the trial court had miscalculated the attorney fees the petitioner had paid out of marital assets. The appellate court directed the trial court, upon

remand, to redistribute the marital estate in light of the correct amount, which was to be considered an advance on the petitioner's share. DeLarco, 313 Ill. App. 3d at 112. In our view, none of the cases we have reviewed, including DeLarco and Toole, are in conflict with the holding in O'Neill. Accordingly, we disagree with Angeline's contention that dissipation occurs only after an irreconcilable breakdown has occurred, and we turn now to the trial court's specific finding.

It appears that the trial court calculated dissipation, not from when the parties' marriage began undergoing an irreconcilable breakdown, but rather from when the parties' marriage had completed the process of breaking down. This is apparent from the trial court's language in its letter order: "[T]he court fixes the date of irretrievable breakdown as February[] 2005, the date of physical separation." "So when was the breakdown?" "Under the circumstances February 2005 is the date that the marriage was irretrievably broken." This language demonstrates that the trial court was attempting to pinpoint the date on which the parties' marriage "was irretrievably broken" rather than attempting to determine when the marriage began to irreconcilably break down. As previously discussed, dissipation is to be calculated from the time the parties' marriage begins to undergo an irreconcilable breakdown, not from a date after which it is irreconcilably broken. In re Marriage of Olson, 223 Ill. App. 3d 636, 647 (1992).

Before reversing the trial court, however, we must first determine whether the trial court's error in applying the incorrect standard for calculating dissipation was harmless. See In re Marriage of Wilder, 122 Ill. App. 3d 338, 344-45 (1983) ("not every error committed by the trial court in a civil case leads to reversal *** and reversal is required only where it

appears that the outcome might have been different had the error not occurred"). If the parties' marriage began undergoing an irreconcilable breakdown in February 2005, then the trial court's error was harmless. If, on the other hand, the parties' marriage began undergoing an irreconcilable breakdown prior to February 2005, then the error was not harmless, and we must reverse and remand to the trial court for a recalculation of dissipation.

Although the February 2005 argument between the parties does appear to have been the final straw in the process of the irreconcilable breakdown of the parties' marriage, the evidence presented at trial by both Angeline and Nicholas strongly indicates that the parties' marriage was undergoing an irreconcilable breakdown long before then. Between 1997 and 2001, the parties stopped having marital relations, sleeping in the same bedroom, living in the same part of the house, sharing meals, and communicating. They were living in an environment that Nicholas testified, and Angeline did not contest, was hostile. In October 2001, following a confrontation between the parties regarding $6,000 Angeline had withdrawn at a casino, Angeline told Nicholas she wanted a divorce. The following month, she went so far as to write him a letter detailing her "plan" for the future, which included a suggested division of responsibility between the parties for their financial obligations and which indicated that Angeline wanted to keep the marital home. In November 2004, Nicholas began to move personal belongings out of the marital home, and he finally moved out permanently in February 2005. From this evidence, we conclude that the parties' marriage was undergoing an irreconcilable breakdown long before February 2005. See In re Marriage of Carter, 317 Ill. App. 3d 546, 552 (2000) (holding that the trial

court's determination of when the parties' marriage was undergoing an irreconcilable breakdown was against the manifest weight of the evidence where, prior to the date determined by the trial court, the parties only occasionally slept together, mostly lived separate lives, kept finances at arm's length, and did not share meals or child-rearing responsibilities).

According to the trial court's letter order, its determination of February 2005 was based, at least in part, on the fact that the parties "worked together" on Marie's home in 2003. The evidence presented at trial by both parties regarding the repair of Marie's home, however, fails to indicate that the parties' marriage was not undergoing an irreconcilable breakdown in 2003, despite their cooperation on the repairs. Although the evidence did establish that both parties participated in the repair of Marie's house, it appears that each did so apart from the other, much like they lived the rest of their lives. While Nicholas performed a portion of the physical labor, Angeline wrote checks and hired the necessary contractors. Rather than serving as a bonding, or even friendly, experience, the process of repairing Marie's house seems to have been one in which the parties participated simply in order to sell the home.

Angeline argues that the trial court could have found that the marriage was undergoing an irreconcilable breakdown only as of February 2005, because prior to that date Nicholas continued to live in the marital home, the parties attended family events together such as their son's wedding, the parties went out to dinner together a few times, Nicholas helped Angeline take Marie to the casino, and Angeline did the shopping, cooking, and cleaning for the parties. We do not believe that these facts, either individually

-14-

or together, negate the obvious irreconcilable breakdown that was taking place in the parties' marriage prior to February 2005. None of these facts indicates that the parties were attempting to reconcile or were even getting along. Taken with the facts that the parties lived in separate parts of the house, slept in separate rooms, did not communicate, and rarely ate meals together, the facts cited by Angeline indicate, at most, an effort by the parties to maintain a minimum level of civility in front of third parties and to keep the household operating.

As the parties' marriage was undergoing an irreconcilable breakdown prior to February 2005, we hold that the trial court's error in applying the incorrect standard in calculating dissipation was not harmless. Accordingly, we must reverse and remand this matter to the trial court. We do not fix a specific date for when the irreconcilable breakdown began. Rather, we determine only that the irreconcilable breakdown began sometime prior to February 2005. Whether it began in the late 1990s when the parties ceased having marital relations and sharing a bedroom or in 2001 when Angeline stated she wanted a divorce and made a plan for separating the parties' financial responsibilities or at some other time supported by the evidence is a question of fact to be answered by the trial court. See Vancura, 356 Ill. App. 3d at 204. Accordingly, the trial court's decision on the issue of dissipation is reversed and the matter is remanded for further proceedings in accordance with this opinion.

### C. Attorney Fees

Angeline's final argument on appeal is that the trial court erred in failing to treat the parties' attorney fees as advances on their respective shares of the marital estate, under

-15-

section 501(c--1)(2) of the Act (750 ILCS 5/501(c--1)(2) (West 2006)). Nicholas contends that Angeline has forfeited this argument because, although Angeline argued in the trial court that attorney fees paid by the parties should be treated as dissipation, she did not argue that they should be treated as advances on the marital estate pursuant to section 501(c--1)(2).

"Issues not raised in the trial court are [forfeited] and cannot be argued for the first time on appeal." In re Marriage of Minear, 181 Ill. 2d 552, 564 (1998); see also In re Marriage of Wolff, 355 Ill. App. 3d 403, 414 (2005). Forfeiture, however, is a limitation on the parties, not on this court. Village of Lake Villa v. Stokovich, 211 Ill. 2d 106, 121 (2004). When necessary to obtain a just result or to maintain a sound and uniform body of precedent, we may overlook forfeiture and address the merits of the issue. Village of Lake Villa, 211 Ill. 2d at 121. We choose to address Angeline's contention because it is necessary to the development of a sound body of precedent concerning the application of section 501(c--1)(2) of the Act. See Collins v. Lake Forest Hospital, 213 Ill. 2d 234, 239 (2004) (choosing to overlook forfeiture where addressing the issue was "critical to the development of a sound body of precedent concerning the proper interpretation, and thus implementation, of legislation concerning vital care and treatment decisions for patients lacking decisional capacity").

Angeline contends that, under section 501(c--1)(2), the trial court erred "as a matter of law" when it failed to treat the parties' attorney fees as advances on their respective shares of the marital estate. Rather, the trial court "skew[ed]" the division of the marital estate in Nicholas's favor to offset the attorney fees he incurred as a result of Angeline's

actions during the dissolution proceedings. Subject to that division, the trial court ordered the parties to be responsible for their respective attorney fees.

Section 501(c--1)(2) of the Act provides:

"Unless otherwise ordered by the court at the final hearing between the parties or in a hearing under subsection (j) of Section 503 or subsection (c) of Section 508, interim awards [of attorney fees], as well as the aggregate of all other payments by each party to counsel and related payments to third parties, shall be deemed to have been advances from the parties' marital estate." 750 ILCS 5/501(c--1)(2) (West 2006).

The plain language of section 501(c--1)(2) makes apparent that the trial court is required to treat the parties' attorney fees as advances, "[u]nless otherwise ordered." (Emphasis added.) 750 ILCS 5/501(c--1)(2) (West 2006); see also In re Marriage of Beyer, 324 Ill. App. 3d 305, 314 (2001) (noting that section 501(c--1)(2) creates a presumption that attorney fees will be treated as advances, but that the presumption does not apply where the court orders otherwise).

Here, the trial court ordered otherwise when following trial it ordered that, subject to the division of the marital estate, which was skewed so as to compensate Nicholas for attorney fees incurred as a result of Angeline's behavior during the proceedings, the parties were to be responsible for their respective attorney fees. Accordingly, the trial court's decision falls squarely within the confines of the statute.

Angeline makes no other argument as to why the trial court's decision on attorney fees was erroneous, except to argue in her reply brief that the trial court erred in not making clear what portion of Nicholas's fees was attributable to Angeline's behavior.

Although Angeline contends that this argument was encompassed by the general statement in her opening brief that the trial court "committed reversible error, as a matter of law," the argument was not addressed in her opening brief and was raised for the first time in her reply brief with no authority to support her contention of error. Thus, we will not consider it. 210 Ill. 2d R. 341(j) (stating that a reply brief "shall be confined strictly to replying to arguments presented in the brief of the appellee"); 210 Ill. 2d R. 341(h)(7) ("Points not argued [in the appellant's brief] are waived and shall not be raised in the reply brief ***"); Sylvester v. Chicago Park District, 179 Ill. 2d 500, 507 (1997). Thus, we cannot say that the trial court abused its discretion in requiring the parties to be responsible for their respective attorney fees. See In re Marriage of Bussey, 108 Ill. 2d 286, 299 (1985) ("The awarding of attorney fees and the proportion to be paid are within the sound discretion of the trial court and will not be disturbed on appeal, absent an abuse of discretion").

As this matter is remanded for further proceedings on the issue of dissipation, the trial court may readdress the division of the marital estate, including attorney fees, in light of its recalculation of the amount of dissipation established from the beginning of the irreconcilable breakdown of the marriage.

CONCLUSION

For the foregoing reasons, the judgment of the Du Page County circuit court is reversed and the matter is remanded for further proceedings.

Reversed and remanded.

McLAREN and SCHOSTOK, JJ., concur.