**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190197-U

Order filed October 5, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| In Re: The Marriage of | ) | Appeal from the Circuit Court |
| MAY S. YAZEJI, | ) | of the 14th Judicial Circuit, |
| | ) | Rock Island County, Illinois, |
|     Petitioner-Appellee, | ) | |
| | ) | Appeal Nos. 3-19-0197, 3-19-0361 |
|     and | ) | (consolidated) |
| | ) | Circuit Nos. 13-D-481 |
| BASSAM A. ASSAF, | ) | |
| | ) | Honorable |
|     Respondent-Appellant. | ) | Peter R. Church, |
| | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Presiding Justice O'Brien and Justice Peterson concurred with the judgment.

_____

**ORDER**

¶ 1     *Held*:  (1) The trial court's finding that parental alienation had not occurred was not against the manifest weight of the evidence; (2) the trial erred by not considering the husband's claim of dissipation of marital assets occurring after the date that the trial court found the parties' marriage had begun to break down irretrievably; and (3) the trial court abused its discretion by awarding the husband to pay a portion of the wife's attorney fees without considering whether the wife was able to pay her own attorney fees.

¶ 2    Following a bench trial, the trial court entered an order dissolving the parties' marriage. The order granted sole decision-making authority regarding the parties' minor children and the majority of parenting time to the mother, petitioner-appellee, May Yazeji (May). The trial court found that that the father, respondent-appellant Bassam Assaf (Bassam), had failed to prove that May had alienated the parties' children against him. The court also rejected Bassam's claim for dissipation and ordered Bassam to pay $120,000 of May's attorney fees in an effort to equalize the distribution of assets between the parties. Bassam appeals each of these rulings.

¶ 3                                                    FACTS

¶ 4    The parties were married for 17 years and had four children together, JAA, JCA, NEA, and JNA. Both parties are medical doctors. Bassam is a neurologist and May is an OB/GYN.

¶ 5    On October 10, 2013, May filed a petition for dissolution of the parties' marriage pursuant to the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (750 ILCS 5/101 *et seq.* (2016)). At that time, JAA was 10, JCA was 9, NEA was 4, and JNA was 3. Before May filed the dissolution petition, she and the children had lived with Bassam and his mother. After filing the petition, May moved out of the family home permanently and took the children with her without Bassam's consent. Bassam alleged that, from that time forward, May engaged in a campaign to disparage Bassam and his mother and to alienate the children from them.

¶ 6    While the dissolution petition was pending, temporary custody was awarded to May pursuant to the parties' agreement. Bassam subsequently filed an emergency petition for visitation alleging various acts of parental alienation by May. After conducting a hearing, the trial court awarded Bassam visitation on January 7, 2014.

¶ 7    On November 17, 2014, the trial court appointed Dr. Kirk Witherspoon, a psychologist, to perform a custody evaluation pursuant to section 5/604.5 of the IMDMA (750 ILCS 5/604.5

(West 2014)). In April 2016, Dr. Witherspoon issued a report in which he observed that the children had "grown quite manipulative in *** advocating for remaining in the primary care of their mother." Dr. Witherspoon found that May "appears to have inadvertently or directly reinforced some of these efforts, even to the point of effecting irresponsible conduct." He recommended an equal and alternating shared parenting plan of 5-5-2-2, but noted that, if that was not feasible, it would be in the children's best interests to "stay for the most part in the home of their father during the weeks of their times in school in view of his greater propensity to effect discipline with school attendance and possibly homework."

¶ 8        On February 10, 2016, May filed a motion to modify the temporary custody order. Bassam filed his response and counter-petition to modify on November 16, 2016. After interviewing the children *in camera* and conducting a hearing, the trial court adopted the recommendations of Dr. Witherspoon and modified the parties' parenting time to a 50-50, week-on, week-off schedule. The court further ordered that all four children attend individual counseling with John Sample, a counselor.

¶ 9        The trial court's modified parenting order went into effect on January 9, 2017. The next day, May filed an emergency motion for an order of protection against Bassam. In her motion, May alleged that Bassam had abused her and their son JCA, who was 12 years old at the time. She claimed that Bassam had pushed JCA to the floor and injured him while enforcing a "time out" The trial court granted May's petition in part and denied it in part. The court found that Bassam had abused JCA and it entered an order of protection against John as to the children. However, the court found that May had failed to prove that Bassam had abused her. The court reinstated the 50-50 parenting schedule and ordered Bassam not to use physical force when

enforcing a time out on the children. Our court later affirmed the trial court's order, with Justice Schmidt dissenting.

¶ 10      On May 26, 2017, May filed an amended motion for modification of parenting time.  In her motion, May sought temporary primary residential custody of the children and moved to eliminate the 50-50 parenting time.

¶ 11      Bassam filed an opposition to May's motion and a counter-petition to modify the parenting schedule. He also filed a petition for relief from the order of protection pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)). In the latter petition, Bassam presented certain DCFS and police reports that were not available at the time of the hearing on the order of protection.  The reports contained allegations of abuse by Bassam that Bassam claimed were false and unfounded.  Bassam further contended that May had shown an unwillingness to foster a close relationship between Bassam and his children, and he argued that the children's unequivocal favor of their mother was a classic symptom of children affected by parental alienation.  In support of this argument, Bassam cited (1) Dr. Witherspoon's report; (2) May's secretion of the children from October 2013 until a visitation order was entered in December 2013, (3) the allegedly unfounded DCFS and police reports, and (4) the children's actions and feelings which Bassam alleged were representative of alienated children.

¶ 12      On June 19, 2017, a second temporary custody hearing was held. During the hearing, Sample testified that Bassam was not a good listener and that he needed to work on empathy with his children, stop yelling at them, and stop talking about JCA's weight.  Sample further opined that Bassam should be more involved in the children's lives by attending more of their activities, and that Bassam needed to give the children more freedom.  Sample thought that Bassam was uncomfortable with the direction the therapy weas heading, and he suggested that

4

Bassam undergo individual therapy. Although Sample identified some factors suggesting that parental alienation could be occurring, he stated that he was only a clinician and that parental alienation could not be formally diagnosed without a forensic evaluation. Ultimately, Sample found the evidence of parental alienation to be inconclusive, and he never diagnosed parental alienation under the Diagnostic and Statistical Manual (DSM). Sample noted that the children's clear preference for their mother could be the result of parental alienation, or it could be the result of Bassam's alleged abuse and mistreatment of the children.

¶ 13    The trial court declined to modify the 50-50 parenting schedule and both parties were permitted to withdraw their pending motions to modify without prejudice. Sample asked the court to appoint Dr. Jackie Jiang, a clinical psychologist, to evaluate JCA because he wanted to determine whether JCA had PTSD or any other mental disorder. The trial court appointed Dr. Jiang for that purpose. Dr. Jiang was not appointed to do a forensic evaluation to determining whether parental alienation was occurring. By agreement of the parties, Derek Hancks was appointed guardian *ad litem* (GAL)for the children.

¶ 14    On September 1, 2017, Bassam filed an emergency motion to grant him significant decision-making and a majority of parenting time. In support of his motion, Bassam presented a letter from John Sample dated July 29, 2017, which stated that evidence of parental alienation by May was becoming more evident. According to Dr. Sample: (1) the symptoms of alienation appeared to be intensifying, which put the children in significant emotional and developmental maladjustment; (2) May's inappropriate behavior had continued unabated and had escalated; (3) the children were becoming more troublesome and uncontrollable, which necessitated Bassam calling the police on two occasions. Bassam argued that these facts showed that the children were exhibiting severe alienation.

5

¶ 15     On September 27, 2017, May filed a motion for emergency modification of residential placement and parenting-making decisions specifically directed at JCA. Bassam opposed the motion. Bassam subsequently renewed his pending emergency motion to modify custody.

¶ 16     The trial court asked Dr. Witherspoon to update his custody evaluation.  However, on December 15, 2017, Dr. Witherspoon notified the court he would not do so.  Bassam subsequently filed a motion asking the court appoint Dr. Jiang to perform the custody evaluation. update. The trial court denied Bassam's motion because it did not think that an update could be completed before the August 2018 trial date, and because a GAL had been appointed to protect the children's best interests at trial

¶ 17     The trial took place over 36 days.  During the trial, Dr. William Bernet, M.D., a child psychiatrist retained by Bassam, and Dr. Robert Evans, Ph.D., May's rebuttal expert, were called to testify as "instructional experts."  Each doctor educated the court on the elements of parental alienation syndrome, the behavioral symptoms in children that suggest its occurrence, the damaging effect it has upon children, and what may be done to repair such damage.

¶ 18     Dr. Bernet testified that parental alienation is a mental condition wherein the child forms a very strong alliance with one parent (the preferred parent) rejects a relationship with the other parent (the alienated parent) without a good reason." Dr. Bernet stated that the concept of parental alienation is included in DSM- 5, which he described as "the Bible of psychiatry in America." He further testified that the American Professional Society on the Abuse of Children (APSAC) has endorsed the idea that parental alienation is child psychological abuse. According to Dr. Bernet, parental alienation has a devastating effect on the short term and long-term mental health and cognitive functioning of the affected children.

¶ 19 Dr. Bernet testified regarding eight symptoms of parental alienation found in alienated children. He stated that "you don't necessarily have to have all eight" to have a severe case of parental alienation. Dr. Bernet answered hypothetical questions that were based upon the facts in evidence from the court-appointed experts and other exhibits and testimony which exemplified symptoms of parental alienation present in the Assaf children: (1) "Denigration"; (2) "Weak, frivolous or absurd rationalization"; (3) "Lack of Ambivalence"; (4) "Independent thinker phenomenon"; (5) "Enmeshment"; (6) "Absence of guilt"; (7) "Presence of borrowed scenarios"; and (8) "Animosity towards the extended family of the target parent." He explained the difference in symptoms between alienated and abused children.

¶ 20 Dr. Bernet subsequently testified about 17 alienating behaviors performed by an alienating parent. He then answered hypothetical questions based upon the facts in evidence from the court-appointed experts and other exhibits and testimony. Dr. Bernet emphasized that "you hardly ever find all 17 of them. You really just need to have a few of them." Alienating behaviors testified to by Dr. Bernet included: (1) "Denigrating and criticizing the other parent"; (2) "Omitting contact with the other parent"; (3) "Interfering with communication between the child and the parent"; (4) "Communicating disapproval when the child speaks about the other parent"; (5) "Allowing the child to choose between his parents"; (6) "Creating the impression that the other parent is dangerous"; (7) "Asking the child to spy on the other parent"; (8) "Asking the child to keep secrets from the other parent"; (9) "Forcing the child to reject the other parent"; (10) "Cultivating the child's dependency on the favored parent"; (11) "Withholding medical, social, or academic information from the other parent"; (12) "Confiding in the child about adult matters"; and (13) "Encouraging the child to disregard the other parent's values."

¶ 21    Dr. Bernet testified that alienated children require court intervention even if they are doing well in other spheres of life. He opined that separating alienated children from the alienating parent is not traumatic and that the research demonstrates the opposite. He stressed that, when parental alienation has occurred, the court should not give weight to the children's wishes because the child has false beliefs about the alienated parent, cognitive distortions, and delusions.

¶ 22    Dr. Bernet did not render an opinion on whether parental alienation had occurred in this case. He noted that he was unable to render any such opinion because he had not interviewed the children. However, Dr. Bernet testified that abuse of one of the children or of the other parent eliminates the possibility of parental alienation as a theory of explaining the children's dissatisfaction with the abusing parent. He stated that, although there might be an occasional exception, parental alienation does not apply in that situation.

¶ 23    Dr. Robert Evans, Ph.D., testified that he believed Dr. Bernet's presentation on his instructional testimony was "outstanding." He agreed that a parent could easily manipulate a child into believing something that's not based in reality. He noted that making false allegations of abuse is a common and effective tool in alienation cases. Dr. Evans stated that parental alienation is extremely serious and constitutes child psychological abuse. He testified that, if the court were to find that parental alienation occurred in this case, it should order the children to attend one of the two intervention programs testified to by Dr. Bernet, which are documented to be 95 percent effective in reuniting an alienating child with a rejected parent. Dr. Evans agreed that, if the court finds parental alienation, a no-contact order between May and the children for up to 90 days would be necessary.

8

¶ 24    Dr. Evans further testified that physical abuse by one parent against the other parent or any one of the children negated the possibility of parental alienation as to any of the children. Evans stated that parental alienation is "out of the question" in such cases, although he acknowledged later in his testimony that "there might be occasional exceptions" to this rule.

¶ 25    When asked whether he had reached "any opinions or determination" as to whether parental alienation had occurred in this case, Dr. Evans responded that he "didn't make any determinations." Dr. Evans did not review any of the records subpoenaed from and produced by Dr. Witherspoon, Dr. Jiang, or Sample. He did not interview May or the children.

¶ 26    Sample testified regarding alienating behaviors by May that he had either observed or was aware of. He described how May's behaviors matched with what the research teaches about parental alienation. Sample further testified that a temporary no-contact period between the alienating parent and the children (usually for 60-90 days) is an essential and a necessary feature of successful programs.

¶ 27    After reviewing Dr. Witherspoon's report, Sample opined that it "raised a lot of 'red flags.'" Specifically, Sample noted that Dr. Witherspoon did not report the allegations of Bassam's abuse of the children to child protective services despite the fact that he was a mandated reporter. After he reviewed Dr. Witherspoon's report, Sample met with the family and watched the parents interact with the children. He noted that the children, particularly the older boys, expressed a strong desire to stay wither their mother and not to be with their father. Sample found it clear that JCA had an "agenda" and wanted Sample to help him not be with his father. Sample observed signs of "intense emotional enmeshment" between the older two boys (especially JCA) and their mother: He described how this "unhealthy" and "toxic" "collaboration" between the mother and the older two boys would play out in the therapy

9

sessions. He observed May manipulate the children and noted that, at times, May and the children appeared to give collaborative, "rehearsed" responses to his questions. Sample noted that, during one therapy session, JAA told Sample that he and JCA had "a plan" that would enable them to remain in their mother's custody. Sample thought that May was undermining and abusing the therapeutic process and using it to obtain evidence against Bassam for the litigation. He further noted that the children never criticized May, which is a hallmark of alienation. Sample wrote a letter to the court reported his concerns with May's apparent manipulation of the children.

¶ 28 Sample testified that Bassam was not a perfect parent and that Bassam "struggle[d] with empathy." Sample told Bassam that he needed to stop yelling at the children and discussing JCA's weight, and that he needed to be more involved in the children's lives (such as by attending their activities). However, Sample noted that there were times when Bassam tried to follow Sample's advice in this regard and "responded quite well." By contrast, May refused to follow Sample's advice. Throughout Sample's interaction with the family, he never witnessed the children demonstrate any fear of Bassam. If anything, they were aggressive towards him. However, Sample testified how May's unfounded and irrational fears negatively affected the children's perception of Bassam. Sample further testified that May continued to profess that "she still loved [Bassam] and wished they were married and that the family was staying together." It was evident to Sample that May was "clearly punishing [Bassam] for not loving her" and that "she was going to continue her course unless [Bassam] came back." Sample observed "[g]rowing evidence of Dr. May Yazeji as an alienating parent and Dr. Bassam Assaf as a target parent."

¶ 29 Nevertheless, Sample did not formerly diagnose parental alienation. He found the evidence of parental alienation to be "inconclusive," and he stated that a forensic examination

10

would be required before the occurrence of alienation could be established. Sample testified that he did not rule out that Bassam had abused the children. Thus, Sample could not tell whether the children were siding with May over Bassam because of parental alienation by May or because of abuse by Bassam.

¶ 30    Dr. Jiang also testified. Dr. Jiang examined JCA to determine whether he had PTSD or any other mental disorder. While conducting her psychological evaluation, Dr. Jiang saw signs of pathological enmeshment between May and John. She testified how she was very concerned when May informed her of JCA's desire to sleep with her given that he was 13 years old. Dr. Jiang saw signs of "cognitive error" and "cognitive distortion" in JCA, which is "quite common among children in parental alienation cases." While May and John continued to claim Bassam was "abusive," John's projective drawings did not show any similarities with the drawings of children who have actually been abused. Dr. Jiang, in her review of the case, found instances of May engaging in "therapist shopping" in order to obtain medical testimony to support her own needs. Dr. Jiang also reported that she had seen evidence of May's alienating behaviors.

¶ 31    Dr. Jiang testified that there were four types of parents: authoritarian, authoritative, permissive, and uninvolved. She testified that authoritarian parents are overly forceful and rigid, and that this type of parenting can be inappropriate for correcting a defiant, emotionally troubled child. She noted that an "authoritative" parent is one who sets boundaries and enforces rules empathically, showing that he or she cares about and respects the child and is correcting the child out of love. Dr. Jiang opined that this is the best type of parent. When the trial court asked her if she could classify Bassam and May under these categories, she testified that she could not because she had not observed the children interact with the parents.

11

¶ 32    Dr. Jiang diagnosed JCA with "adjustment disorder, with mixed disturbance of emotions and conduct, behavioral and emotional traits of parental alienation." Dr. Bernet opined that Dr. Jiang's diagnosis would be consistent with a child's symptoms of parental alienation.

¶ 33    Derek Hancks, the GAL, also testified. Hancks filed two reports in this case—one on April 27, 2018, and a supplemental report after the trial on December 11, 2018. In his supplemental report, Hancks stated that, while he believed May was enmeshed with the children, he "cannot say [May's enmeshment with the children] arises to direct parental alienation." Hancks also characterized Bassam as "extremely rigid and un-flexible [*sic*] in his parenting skills "and that this "causes the children to revolt against him." He observed that the children "appeared very honest and forthcoming during in camera discussions with the Judge" and "seemed very clear and concise in their preference to stop the week on/ week off parenting schedule." Hancks ultimately recommended a "more orthodox schedule" with the children "primarily living with their mother." Hancks conceded he did not have the "training and degrees" possessed by the court-appointed medical experts in this case that would enable him to reach a conclusion as to whether or not parental alienation exists in this case.

¶ 34    May testified to several instances when Bassam had abused her or one or more of the children. For example, she testified about the "time out" incident with JCA, and about another incident where Bassam put his hand over JCA's mouth in a hotel room on a vacation in New York,[1] and about several other instances wherein Bassam had physically threatened the children. She also testified that the two younger children, an eight-year-old girl and a seven-year-old boy, were forced to shower with each other and with Bassam's mother while staying at her house.

---

[1] Before trial, May filed a rule to show cause regarding this incident, and the trial court found that Bassam had violated the order of protection by physically disciplining JCA.

12

The children claimed that, during these incidents, Bassam's mother had the children suck on her nipples and "rub her privates." May also recounted multiple alleged instances wherein Bassam had neglected the children. For example, she stated that Bassam: (1) often failed to attend the children's sporting events and other activities, (2) sometimes refused to allow May to attend such activities, (3) failed to pick up JAA after a game, and (4) was uninvolved with the children's lives.

¶ 35 May testified that she had always taken the majority of the responsibility for training the children and that she spent far more time with them that Bassam did. May denied ever alienating the children from Bassam. To the contrary, she claimed that she always encouraged the children to maintain a relationship with their father, to obey their father, and to listen to him during their time with him. She produced some texts and e-mails that she sent to the children corroborating this.

¶ 36 May's sister and a few of her friends each testified that May was a model parent and that they never heard May say a bad word about Bassam

¶ 37 Bassam denied ever abusing May or any of the children. He explained that the time out incident and the New York incident were both his attempts to get the children under control when they had become completely unruly, defiant, and unmanageable due to May's alleged alienation. For example, Bassam claimed that the children were screaming in the New York hotel room and had defied Bassam orders that they stop, and Bassam was afraid they would get kicked out of the hotel. Bassam testified that JCA was particularly defiant. According to Bassam, JCA physically resisted any attempt at discipline, he kicked Bassam in the crotch, and on one occasion, he spat on Bassam. Bassam also testified to several instances of alienating behavior by

13

May, and he produced e-mails and texts that May had sent to the children in an attempt to corroborate his claim.

¶ 38    Bassam filed a notice to seek recovery for May's alleged dissipation of marital assets during a time when the marriage had begun to break down irretrievably. He introduced evidence of various expenditures by May and other actions May took that allegedly demonstrated dissipation, including excessive credit card expenses, tax penalties, excessive attorney fees, and foreclosure expenses due to May's negligence.  Bassam also sought attorney fees and disputed May's claim for attorney fees.

¶ 39    The trial court found that Bassam had fallen "far short" of establishing parental alienation.  The court noted the multiple witnesses to Bassam's abuse of one or more of the children and the prior court finding of abuse.  It also relied on the testimony of May's friends and the e-mails May sent to the children suggesting that May was encouraging them to maintain a relationship with their father and to believe that their father wanted what was best for them and was acting in their best interests.

¶ 40    In allocating parenting time, the trial court applied the governing factors listed in section 5/602.7 of the IMDMA and analyzed the evidence applicable to each factor.  The court found that several of the factors favored May, including: (1) the wishes of each parent; (2) the children's wishes; (3) the amount of time each parent spent in caretaking; (4) the parties' prior agreement that May would be the children's primary caretaker; (5) the fact that the children were well bonded with their mother, with each other, and with May's family; (6) the fact that the children were comfortably adjusted in May's home and not in Bassam's; (7) the fact that there was concerning evidence that Bassam had inappropriately threatened or discipled the children on more than one occasion, and no evidence that May had ever done so; (8) May's willingness and

14

ability to put the children's' needs above her own; (9) Bassam's threatened or actual abuse of the children; and (10) the fact that May had encouraged the children to maintain a relationship with Bassam and to believe that Bassam wanted what was best for them and was acting in their best interests, whereas Bassam had alleged from the start that May was alienating him. The court found that the remaining factors under section 5/602.7 favored neither party. It found no factors that favored Bassam.

¶ 41    The court also relied on the GAL report and the expert testimony. Although Dr. Jiang testified that she could not opine on the Bassam's or May's parenting styles without observing them interact with the children, the court concluded that Bassam was an "authoritarian" parent and May was an "authoritative" parent with some "permissive" traits.

¶ 42    In allocating decision-making authority, the trial court applied the governing factors prescribed in section 5/602.5 of the IMDMA. The court found that several of these factors favored May, including: (1) the parties' implicit agreement that the children were to be raised Catholic (which is May's faith, not Bassam's); (2) the willingness and ability of the parent to encourage the children to have a continuing relationship with the other parent; (3) threatened or actual physical violence by one parent against the children; (4) the occurrence of abuse against a child or other member of the household. The court found that the remaining statutory factors either favored neither party or did not apply. The court concluded that none of the statutory factors favored Bassam.

¶ 43    The trial court rejected Bassam's dissipation claim because it found that the parties' marriage had begun to break down irretrievably in September or October of 2013, after some of the alleged dissipation had occurred, not in September 2012, as Bassam alleged. The court further ordered Bassam to pay $120,000 of May's attorney fees in order to "equalize" the

allocation of assets between the parties. After allocating that payment of attorney fees, the parties' each received roughly 50% of the estate, with May's portion being very slightly higher.

¶ 44 This appeal followed.

¶ 45                                   ANALYSIS

¶ 46                              1.  Parental Alienation

¶ 47 Bassam argues that the trial court erred in refusing to modify its prior judgments on parenting time and the allocation of decision-making authority due to May's alienation of the children from Bassam. We will not reverse a trial court's allocation of parenting responsibilities (*e.g..*, parenting time and decision-making authority) unless it is against the manifest weight of the evidence. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). We afford the trial court's rulings on these issues great deference because the trial court is in the best position to assess the credibility of witnesses and to determine the child's best interest. *In re Marriage of Lonvick*, 2013 IL App (2d) 120865, ¶ 33. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent or the trial court's finding is unreasonable, arbitrary, or not grounded in the evidence. *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 80 (1996). In determining whether a judgment is contrary to the manifest weight of the evidence, the evidence is viewed in the light most favorable to the appellee. *Marriage of Bates*, 212 Ill. 2d at 516.

¶ 48 There was sufficient evidence presented in this case to justify the trial court's rejection of Bassam's claim of parental alienation by May. Although Dr. Witherspoon's opinion testimony arguably supports an inference of the occurrence of parental alienation, Dr. Witherspoon did not explicitly opine whether alienation had occurred. None of the other experts rendered an opinion on this issue. However, Drs. Evans and Bernet thoroughly explained the elements and symptoms of parental alienation to the court. Dr. Evans and Dr. Bernet each opined that the abuse of the

16

children by one parent negated the possibility of parental alienation in almost every instance. There was evidence that Bassam had physically abused one or more of the children on several occasions. An order of protection was entered against Bassam for abusing JCA, and we affirmed that order. In a pretrial hearing, the trial judge found that Bassam had physically disciplined JCA in New York in violation of the order of protection. Moreover, the children testified as to multiple other instances of physical or emotional abuse. The trial court was entitled to credit that testimony. There was also evidence that Bassam neglected the children, which Dr. Evans opined would negate a finding of alienation. Moreover, May's lay witnesses testified that they never saw May say a bad word about Bassam in front of the children.

¶ 49        Bassam argues that the trial court improperly ignored the testimony of its own appointed expert (Dr. Witherspoon), and also disregarded the testimony of Drs. Bernet and Sample. However, Dr. Witherspoon did not update his report as requested by the court. Thus, his report was current only through 2014. Moreover, neither Dr. Bernet nor Mr. Sample offered an opinion on the occurrence of alienation. Both said they could not do so without examining the children, and Mr. Sample said that there needed to be a forensic examination, which he was not qualified to perform.

¶ 50        Bassam also argues that the trial court improperly relied upon the children's *in camera* testimony because, if the children were alienated, their testimony would be of no probative value. However, in finding no alienation, the court did not rely solely on the children's testimony. It also relied on e-mails corroborating May's claims that she encouraged the children to maintain a relationship with their father and to believe that their father was acting in their best interests. The court also relied on the lay witnesses called by May, the GAL report, and the expert testimony. Although the court may have erred by playing psychologist when it

17

determined the parenting styles of each parent (with no supporting expert opinion from Dr. Jiang or any other expert), there was ample evidence in the record negating Bassam's theory on alienation.

¶ 51        There was also ample evidence supporting the court's allocation of parenting time and decision-making authority. The court thoroughly and carefully considered each of the relevant factors and applied the evidence to each factor.  In so doing, the court found that several factors favored May and none favored Bassam.  That finding is not against the manifest weight of the evidence.

¶ 52                                            2.  Dissipation

¶ 53        Section 503(d)(2) of the IMDMA requires a trial court to consider each party's dissipation of the marital or non-marital property when dividing the property.  Dissipation is the use of marital assets for the sole benefit of one spouse for purposes unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. *In re Marriage of O'Neill*, 138 Ill. 2d 487, 494 (1990); *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 78; *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 374 (2008). Dissipation is premised upon waste and involves the diminution in the marital estate's value due to a spouse's actions.  *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 67.  "Dissipation is to be calculated from the time the parties' marriage begins to undergo an irreconcilable breakdown, not from a date after which it is irreconcilably broken."  *Holthaus*, 367 Ill. App 3d at 375; *In re Marriage of Olson*, 223 Ill. App. 3d 636, 647 (1992).

¶ 54        The party alleging dissipation must first make a *prima facie* showing that dissipation has occurred. *Hamilton*, 2019 IL App (5th) 170295, ¶ 78. Once this showing has been made, the burden shifts to the party charged with dissipation to show with clear and specific evidence how

18

the funds were spent. *Id.*; *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 65; *In re Marriage of Rai,* 189 Ill. App. 3d 559, 565 (1989).

¶ 55     Because dissipation is a factual inquiry, we will reverse the trial court's finding on whether dissipation has occurred only if it against the manifest weight of the evidence. *Hamilton*, 2019 IL App (5th) 170295, ¶ 79; *Holthaus*, 387 Ill. App. 3d at 374. The court's findings are against the manifest weight of the evidence if the opposite conclusion is clearly apparent or if the findings are not based on the evidence. *Hamilton*, 2019 IL App (5th) 170295, ¶ 79; *Holthaus*, 387 Ill. App. 3d at 374.  The basis of this deferential standard is the trial court's ability to observe the witnesses and evaluate their credibility. *In re Marriage of Asta and Pappas*, 2016 Il App (2d) 150160, ¶ 17.

¶ 56     If the trial court finds that a party has dissipated marital assets, the court may charge the amount dissipated against his or her share of the marital property so as to compensate the other party. In re *Marriage of Partyka*, 158 Ill. App. 3d 545, 550 (1987). The court is not *required* to charge against a party the amounts found to have been dissipated, but may do so. *In re Marriage of Murphy*, 259 Ill. App. 336, 340 (1994).  That decision lies within the trial court's sound discretion, and we will reverse the trial court's decision on this issue only if the trial court has abused its discretion. *Partyka*, 158 Ill. App. 3d at 550.  A court abuses its discretion when it acts arbitrarily and without employing its conscientious judgment or where it exceeds the bounds of reason and ignores recognized principles of law so that substantial injustice results.  *Id.*  That is, an abuse of discretion occurs where no reasonable person would take the view adopted by the trial court.  *Id.*

¶ 57     In this case, Bassam claimed that May dissipated marital assets from 2012 through 2017, and for some time periods thereafter.  The trial court found that the marriage began to break

down irreconcilably "some time in the September to October 2013 time frame." The court then noted that, because of its finding as to the date the marriage began to break down, it did not factor in dissipation of marital assets by either party when allocating the marital estate.

¶ 58    Bassam argues that the court erred as a matter of law by failing to even consider his *prima facie* case of dissipation, much of which was alleged to have occurred after October 2013. Bassam contends that the court seemed to believe that the October 2013 breakdown date precluded a *prima facie* case of dissipation.

¶ 59    We agree. Several of the acts of dissipation claimed by Bassam were alleged to have occurred after September to October of 2013, the period when the court found the parties' marriage began to break down irreconcilably. For example, Bassam alleged that May had failed to timely pay property taxes on her clinic property in 2015 and 2016, which resulted in the 2014 taxes being sold by the Rock Island County clerk. Moreover, May admitted that she withdrew over 146,000 from her IRA on September 27, 2013, and Bassam provided evidence that May had opened multiple credit cards and incurred charges on the cards from late September through mid-October of 2013. Because the trial court did not identify exactly when during the "the September to October 2013 time frame" the marriage began to break down, these costs could have been made after the breakdown date, and could therefore constitute dissipation. The trial court's failure to consider these claims of dissipation, without addressing whether Bassam had presented a *prima facie* case of dissipation as to those claims, was error. *Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 86; *Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 71.

¶ 60    May argues that Bassam failed to present a viable claim for dissipation because he failed to comply with the mandatory requirement of section 503(d)(ii) of the IMDMA. That section provides that the court in a dissolution proceeding shall consider dissipation in dividing the

20

marital property provided that: (1) the party alleging dissipation gives notice of its intent to claim dissipation no later than 60 days before trial or 30 days after discovery closes, whichever is later; and (2) the notice contains, at a minimum, "a date or period of time during which the marriage began undergoing an irretrievable breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred." 750 ILCS 5/503(d)(ii) (West 2018).

¶ 61    It is undisputed that Bassam's notice was timely. However, May argues that the notice was not specific enough as to the date of the marriage's irretrievable breakdown and the categories and amounts of dissipation.

¶ 62    We find this argument to be unpersuasive. Bassam's notice supplied a date that the marriage began to break down irretrievably (specifically, "no later than September 2012"). Bassam's notice also listed several specific categories of alleged dissipation, some with specific dollar amounts, others without dollar amounts. Section 503(d)(ii) does not require the movant to include specific dollar amounts. Rather, it merely requires the movant to "identify the property dissipated." 750 ILCS 5/503(d)(ii) (West 2018). Bassam did this by identifying specific categories and types of dissipated property. In any event, even assuming *arguendo* that the statute required Bassam to include specific dollar amounts, Bassam did so as to at least some of the allegedly dissipated assets. At a minimum, the trial court should have considered those claims.

¶ 63    May further argues that the there was evidence suggesting that the marriage began to break down irretrievably much later than the trial court found. She also maintains that the all of the expenditures at issue were legitimate living expenses or business expenses, and the tax penalties, high attorney fees, and foreclosure expenses were all Bassam's fault. Thus, she

21

maintains, there was no dissipation.  Because we hold that the trial court erred by failing to consider some of Bassam's claims for dissipation, we need not consider these arguments. The trial court has not considered whether Bassam has made a *prima facie* showing of dissipation as to certain expenses made and costs incurred after September to October 2013.  May's arguments should be made at a hearing on the merits of Bassam's claims.[2]

¶ 64    We therefore remand the matter to the trial court so that it may conduct such a hearing. On remand, the trial court must determine whether Bassam has stated a *prima facie* case of dissipation and, if so, whether May can show with clear and specific evidence how the funds were spent.  If the court find that dissipation occurred, it must then decide whether to charge the amount dissipated against May's share of the marital property so as to compensate Bassam.

### 3.  Attorney Fees

¶ 65    Bassam further argues that the trial court erred in awarding May $120,000 in attorney fees without considering her ability to pay such fees.

¶ 66    A party is generally and primarily responsible for his or her own attorney fees. *In re Marriage of McGuire*, 305 Ill. App. 3d 474, 479 (1999).  However, section 503(j) of the IMDMA allows for fee shifting at the conclusion of pre-decree proceedings by way of contribution.  750 ILCS 5/503(j) (West 2016).  Fee shifting provisions, such as section 503(j), are an abrogation of the common law and are therefore strictly construed. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 64. The movant seeking contribution must show his or her inability to pay attorney fees. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 19; *In re Marriage of Schneider*, 214 Ill. 2d 152, 175 (2005); see also *In re Marriage of Keip*, 332 Ill. App. 3d 876, 884-85 (2002) ("It

---

[2] In any event, May cannot challenge the trial court's finding of the marital breakdown date on appeal because Bassam has not appealed that finding and May has not cross-appealed it.

is not sufficient simply to show that one party has a greater ability to pay."); *Uphoff v. Uphoff,* 80 Ill. App. 3d 145, 147 (1980).  A party is "unable" to pay if "the court finds that requiring the party to pay the entirety of the fees would undermine his or her financial stability." *Marriage of Heroy*, 2017 IL 120205, ¶ 19; see also *In re Marriage of Awan*, 388 Ill. App. 3d 204, 215 (2009) (ruling that a trial court properly awards attorney fees to a spouse that that has the ability to support herself but "would exhaust a large portion of her assets to pay all of the fees").

¶ 67        In determining a party's ability to pay attorney fees, the court must base its determination on the factors for dividing marital property under section 503(d) of the Act.  750 ILCS 5/503(j) (West 2016); *Marriage of Heroy*, 2017 IL 120205, ¶ 20.  These factors include, *inter alia*: the dissipation by each party of the marital property by each spouse; the value of the property assigned to each spouse; the duration of the marriage; the relevant economic circumstances of each spouse when the division of property is to become effective; the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; the custodial provisions for any children; whether the apportionment is in lieu of or in addition to maintenance; and the reasonable opportunity of each spouse for future acquisition of capital assets and income. 750 ILCS 5/503(d) (West 2016). If maintenance is awarded, the court must also consider additional factors listed in section 503(d), including, *inter alia*, the income, needs, employability, and realistic present and future earning capacity of each of the parties.  750 ILCS5/504(a)(1)-(14) (West 2006); *Marriage of Heroy*, 2017 IL 120205, ¶ 20.

¶ 68        The determination of a contribution to attorney fees is a matter of the trial court's discretion and we will reverse the decision only if the court abused its discretion.  *In re Marriage of Pond and Pomrenke*, 379 Ill. App. 3d 982, 992 (2008).  A trial court abuses its discretion

23

when its ruling is arbitrary, fanciful, or unreasonable, no reasonable person would take the view adopted by the trial court, or its ruling rests on an error of law. *In re Marriage of Benink*, 2018 IL App (2d) 170175, ¶ 32.

¶ 69 In this case, the trial court ordered Bassam to pay $120,000 of May's attorney fees without finding that May was unable to pay her own attorney fees. The court stated that it awarded May attorney fees "in order to more equitably equalize the distribution of marital assets and liabilities." The court found that, given the distribution of assets to Bassam, he was able to pay these fees. However, it did not find that May was unable to pay them. That was error.

¶ 70 May makes two arguments in support of affirmance. First, she contends that the trial court was not required to find that she was unable to pay her attorney fees because the trial court awarded her attorney fees under section 503(d) and other principles of equity in an attempt to equalize the parties' assets. However, a trial court may not award attorney fees under the guise of equitable allocation. *In re Marriage of Charles*, 284 Ill. App. 3d 339, 348 (holding that the award of attorney fees to the husband as part of an equitable distribution of assets "in effect required the wife to contribute" to the husband's attorney fees and that the award was improper because the husband had the ability to pay his own fees). The factors outlined in section 503(d) "are the tools used by the court to decide whether a party is unable to pay and whether the other party is able to do so." *Marriage of Heroy*, 2017 IL 120205, ¶ 32. Accordingly, the section 503(d) factors may not be used as a basis for awarding attorney fees merely as part of the trial court's equitable division of marital property. A finding that the party seeking attorney fees is unable to pay them is still required. *Marriage of Heroy*, 2017 IL 120205, ¶¶ 21-22, 30. Here, the trial court made no such finding.

¶ 71    May also argues that, regardless of the trial court's reasoning, we should affirm its judgment because the record reflects that May would have to exhaust a large portion of the assets awarded to her to pay the attorney fees.  This argument fails.  The trial court awarded attorney fees to May without finding that she was unable to pay her own attorney fees. That was an error of law, and therefore an abuse of discretion. *Marriage of Benink*, 2018 IL App (2d) 170175, ¶ 32 (ruling that a trial court abuses its discretion when "its ruling rests on an error of law").  In addition, as noted above, the trial court failed to consider whether May had dissipated assets of the marital estate, which is one of the factors the court must consider under section 503(d).  Further, there is evidence in the record supporting each of the party's arguments as to whether May lacked the ability to pay her attorney fees.  The trial court is in the best position to weigh the evidence and to determine whether May was unable to pay her attorney fees in full.  We therefore remand the matter to the trial court so that it may make that determination.

¶ 72                                    CONCLUSION

¶ 73    For the reasons set forth above, we affirm the judgment of the circuit court of Rock Island County in part and reverse in part.  We remand to matter to the circuit court and direct it to determine the issues of dissipation and the contribution of attorney fees in distributing the marital estate consistent with our rulings and our analysis of those issues.

¶ 74    Affirmed in part and reversed in part; Cause remanded.

25