2022 IL App (2d) 210370-U
No. 2-21-0370
Order filed November 23, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| MONICA I. BILLINGTON, | ) | of Du Page County. |
| | ) | |
| Petitioner-Appellee and | ) | |
| Cross-Appellant, | ) | |
| | ) | |
| and | ) | No. 19-D-1949 |
| | ) | |
| JAMES E. BILLINGTON, | ) | |
| | ) | Honorable |
| Respondent-Appellant and | ) | Michael W. Reidy, |
| Cross-Appellee. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in the amount of its maintenance award based on respondent's gross income over his base salary amount, nor did it err in imposing no income cap upon which the percentage of his gross income would apply. The allocation of the parties' assets and debts was not against the manifest weight of the evidence presented. Petitioner's claim of dissipation was properly denied. The trial court's classification of the maintenance award as "reviewable and modifiable" was an abuse of discretion.

¶ 2    Respondent, James Billington, appeals from the judgment for dissolution of the parties'

marriage, contending that the trial court erred by (1) deviating from the guidelines in section 504(b-

1)(1)(A) of the Illinois Marriage and Dissolution of Marriage Act (IMDA) in calculating a maintenance award based on James' gross income; (2) imposing no income cap upon which the percentage of his gross income would be applied to the maintenance award; and (3) deviating from the parties' agreement in the allocation of assets and debts. Petitioner, Monica Billington, cross-appeals from the dissolution judgment, contending that the trial court erred by (1) awarding her "reviewable and modifiable" as opposed to indefinite maintenance; and (2) disallowing her dissipation claim. For the reasons that follow, the trial court's dissolution judgment is affirmed in part, vacated in part, and remanded for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4    On October 10, 2019, Monica filed a petition for dissolution of the parties' marriage.[1] At the time of filing, both parties were 57 years of age. Three children, triplets, were born to the parties as a result of their July 6, 1991, marriage, and Monica's older child was adopted by James. All children had since been emancipated.

¶ 5    On August 4, 2020, Monica filed an amended notice of intent to claim dissipation. She alleged that James unilaterally withdrew funds from the parties' Chase Bank account on 14 separate occasions between January 10, 2020, and April 30, 2020. Monica alleged that James unilaterally withdrew funds from that same Chase Bank account numerous times in 2019. Other allegedly unilateral withdrawals from the Chase Bank account alleged to have been made by James between 2015 and 2018 were cited in the notice. Finally, two allegedly unilateral withdrawals by James in May and December 2019 from a Visa Slate Credit Card were listed. Monica's notice

---

[1] On July 8, 2020, Monica filed an amended verified petition for dissolution of the parties' marriage which incorporated a 2007 postnuptial agreement.

admitted that some of the voluminous 2019 transactions were transfers to the accounts of the parties' children but alleged that James had "surreptitiously transferred funds into the children's accounts and then used the funds to pay for things like mechanic work on his personal vehicles, in effect laundering his dissipation activities through the children."

¶ 6     On September 17, 2020, the parties proceeded to a bench trial limited to the issues of allocation of debt[2], dissipation, and attorney's fees. Before presenting evidence on the relevant issues, the parties' counsel and the trial court engaged in the following exchange regarding maintenance:

"THE COURT: Then it is 5,000 [monthly] for maintenance.

[MONICA'S COUNSEL DEMLING]: 5,000 plus a percentage of gross over his salary of - - is it 253?

[MONICA'S COUNSEL STELLA]: 257,800.

[MONICA'S COUNEL DEMLING]: I think they were at 33 percent of net. We wanted 30 percent of gross. You know, I would suggest a number between 25 and 30 percent of gross is fair.

THE COURT: 27.5.

[MONICA'S COUNSEL DEMLING]: There you go.

[JAMES' COUNSEL ROE]: And my suggestion was to operate off that and then define that the way [section] 505 [of the IMDMA] does.

[MONICA'S COUNSEL DEMLING]: You know, gross is so much easier.

---

[2] The parties agreed to the distribution of many assets and the maintenance award in their proffer of settlement terms and proposed judgment of dissolution.

THE COURT: It is really easier with gross.

[JAMES' COUNSEL ROE]: Okay. I am - - we're making a record, so I want to make sure that I am making the proper counter.

[MONICA'S COUNSEL DEMLING]: 27.5 percent of gross over the 250 - -

THE COURT: 257,800.

[MONICA'S COUNSEL STELLA]: 257,800.

[JAMES' COUNSEL ROE]: And there is a request for an annual true-up once the parties have their tax returns prepared that they true up.

[MONICA'S COUNSEL DEMLING]: And they have to exchange tax returns.

[MONICA'S COUNSEL STELLA]: And end of the year pay stubs, 1099s, all that good stuff.

[JAMES' COUNSEL ROE]: Everything that is conventional."

Following discussion of the matters agreed to by the parties, the trial court remarked to Monica and James as follows:

"All right. Good morning again, folks. I know we talked last week. We were close. And I want to tell you again your attorneys have done an excellent job. Things break down all the time. I don't hold it against either side.

We really narrowed the issues. We have got some that are left to my decision making, which I will do, and they have made the arguments for you. Some of which has to be presented via evidence and that is mostly the dissipation claim. So, we're going to have some evidence presented today.

I can tell you with 100 percent certainty [that] your attorneys have saved you thousands and thousands of dollars by what they have done so far. I know that may be hard

to believe, but I can tell you that if this had to go into a full-blown trial, you were looking at four to five full days, and that could have depleted almost all of your assets.

So, I know that it is hard to see right now, but I am telling you with utmost sincerity that your attorneys, and with the assistance of the Court in these pretrial conferences, have limited your exposure as far as what you owe."

¶ 7    Trial began with the issue of dissipation. On adverse direct examination, James testified that the parties' triplets began attending Illinois Wesleyan University in 2015 and each received approximately $20,000 in academic scholarship funds and $3,000 in state grants. Before their matriculation, James established 529 accounts for the children through the Nevada College Savings Trust Fund which he funded on a single occasion for their benefit. The accounts no longer existed at the time of trial. Petitioner's Exhibit 11 was introduced and showed a series of withdrawals in 2017 by James from the Nevada College Savings Trust Fund 529 accounts, totaling $359,871.51. James maintained that the withdrawals were made for the purpose of the children's education. He recalled that tuition for each child was between $50,000 and $60,000 per year. He also provided for their room, board, and books. Petitioner's Exhibit 12 showed a series of 2018 withdrawals from the same 529 accounts, totaling $215,983.40. James testified that those funds were used for the same purposes as the 2017 withdrawals.

¶ 8    James then testified to his history as an entrepreneur in which he would start companies, raise financing to build the companies, and then sell the companies before taking a percentage of the total sale. He last sold a company in 2007 and received approximately $6.9 million dollars. Additionally, James received a $700,000 severance from that company. The money James received from that sale had run out some time not long before Monica filed her petition for dissolution of

marriage, prompting him to reenter his old field of entrepreneurship and build a new company. James indicated that his current salary was $257,800, eligible for additional bonuses.

¶ 9     On cross-examination, James' counsel introduced Respondent's Exhibit 15, a document prepared by James along with statements from the parties' joint Chase Bank checking account. The exhibit detailed how the 2017 withdrawals from the Nevada College Savings Trust Fund 529 accounts were deposited into the parties' joint Chase Bank checking account before being dispersed. The documents showed that when James withdrew more than the amount of the children's college expenses, it was recorded as to what amount was a qualified 529 educational expense versus those that were not qualifying 529 expenses. James testified that a February 15, 2017, nonqualifying withdrawal of $51,000 from the parties' checking account was transferred to the parties' joint Vanguard account while additional withdrawals of $51,000 and $43,000 were used to buy either an ETF or mutual fund. James stated that all funds withdrawn from the 529 accounts were deposited into the parties' joint checking account, and what was not used for the children's educational expenses was used for his and Monica's everyday expenses. He was unaware of any funds from the joint checking account being used for something other than family expenses.

¶ 10    Respondent's Exhibit 16, also prepared by James, detailed the activity related to the 2018 withdrawals from the 529 accounts. As with the transactions contained in Respondent's Exhibit 15, James was unaware of any funds being used for something other than family expenses. James was shown Petitioner's Exhibit 75, a copy of Monica's amended notice to claim dissipation. James reviewed the notice and testified that none of the claims of dissipation noted therein were payments or transfers unrelated to a family expense or family purpose.

¶ 11　Monica then testified on direct examination that the parties' children were awarded academic scholarships to Illinois Wesleyan University. She recalled that the parties' two boys had each received $100,000 while their daughter received $83,000, although she had no documentation to support her recollection. As to her work history, Monica recalled last having worked at a Dairy Queen owned by the parties in 2002 or 2003. She also worked as a personal shopper for one day in 1993, as well as one additional day training to be a Chili's waitress sometime before that. She possesses no computer skills and stated that learning them would be difficult for her. She suffers from a heart condition and had spent time in the hospital for it in 2019.

¶ 12　Monica testified that James managed all the family's finances and paid all the bills. She stated that she was unaware that their finances had dwindled as low as they had before she filed the petition for dissolution of marriage. James did not like discussing finances with her. She recalled seeing a packet from Illinois Wesleyan University that explained the children's scholarships and thought that the cost of tuition was between $45,000 and $50,000 in 2015. Monica's assumption was that the tuition costs remained comparable to that amount throughout the children's years of attendance.

¶ 13　On cross-examination, Monica admitted that she and James were living an expensive lifestyle following his 2007 earnings from the sale of his company. She agreed that James had to return to his profession after that money ran out in 2019 or 2020. When given a copy her notice of intent to claim dissipation for review, Monica was asked "was there any one expense that is noted here that you can point to and say that wasn't something for our family?" Monica answered "To be for sure, no. No, I don't."

¶ 14　On redirect examination, Monica stated that she was not sure what any of the expenditures listed in her claim for dissipation were used for. She reiterated that James managed their finances.

She could not recall ever seeing a statement related to their joint Chase account. She never logged in to their Chase online account and stated that she wouldn't know how to do so if she had wanted to.

¶ 15    Following Monica's testimony, the trial court ordered the parties to prepare written closing arguments limited to the issues of debt and dissipation. The parties were directed to submit a proffer of agreed terms. The trial court noted that it would then prepare a letter opinion and direct Monica to prepare a proposed judgment.

¶ 16    Regarding maintenance, the parties' proffer of settlement terms reads as follows:

"**V. Maintenance.**

James hereby waives any and all rights he may have to claim and receive maintenance from Monica, past, present and future, including, but not limited to, every sum of money or thing of value, which now, or which in the future may be, classified as, or called, maintenance or alimony, pursuant to the laws of the state of Illinois or any other state or country.

No income shall be imputed to Monica for purposes of calculating maintenance.

Maintenance is calculated per the statutory guidelines using $0.00 of income per year for Monica and $257,800 for James per his current employment contract with VPD Management, INC.

This Court recommended an upward deviation from the statutory amount in recognition of Monica's age, her needs and her lack of education past high school and total lack of work history. It is noteworthy that Monica is a breast cancer survivor, and has ventricular tachycardia, both of which are additional grounds for this Court to find that Monica cannot become self-supporting with employment income.

James shall pay Monica base monthly maintenance in the amount of $5,000 per month. James shall commence paying maintenance to Monica on the first *** of the month following the entry of a Judgment for Dissolution of Marriage. Any days between the date a Judgment is entered and the first *** of the following month shall be prorated and James shall pay prorated maintenance for those days along with the first month of his maintenance payment. Support will be payable directly to Monica, into an account specified by Monica, on the first *** of each month.

James shall additionally pay 27.5% of any and all gross annual income he receives above $257,800, capped at $7,000,000. Said payments shall be made within fourteen *** days of the date on which James receives said additional income. At the time of the payments to Monica, James shall provide to Monica all documents to substantiate the amounts of his gross additional income and to substantiate all his calculations, including but not limited to: paystubs, award letters, tax returns, including schedules to corroborate documents, contracts for employment, consulting and the like, contracts for any interest in his businesses, K-1's 1099's, W2's and the like.

During the pendency of any proceeding for the review or modification of maintenance, James shall continue to pay to Monica, until further order of court, base monthly maintenance as detailed above, and additional maintenance based on any bonus James receives as detailed above.

On or before May 1st of each year (or by November 1st if either party files for an extension), James shall provide to Monica true and accurate copies of his federal and state income tax returns with all supporting documentation evidencing all sources of income, including but not limited to paystubs, award letters, tax returns, including schedules to

corroborate documents, contracts for employment, consulting and the like, contracts for any interest in his businesses, K-1's 1099's, W2's and the like.

Maintenance duration shall be indefinite based upon the length of the parties' marriage (28.6 years from the date of the marriage to the date of filing). Support will be payable directly to Monica, into an account specified by Monica by an automatic draft from [James'] paycheck to her bank account, on the first *** of each month."

As to the proffer of settlement's agreements on the parties' assets and debts, the items relevant to this appeal are stated as follows:

"**I. Marital Residence.**

The parties herein have agreed and entered into a Listing Agreement with RE/MAX Traders Unlimited for the listing and sale of their former Marital Residence *** which is currently on the market.

The proceeds from the sale of the Marital Residence shall be allocated solely to Monica, who shall receive any and all net equity from the sale of this property after all closing costs and other applicable costs related to the sale have been paid, and after the outstanding mortgage balance has been satisfied from the proceeds of the sale. Monica shall also retain all of the personal property inside of the Marital Residence, including but not limited to furniture and other items of personal property.

***

**II. Jewelry.**

The Court expressly found that all of the items of jewelry given to Monica by James were gifts. Monica shall keep all items of jewelry given to her by James at any point prior to or

during the marriage, and any and all other items of jewelry otherwise in Monica's possession or control ***.

**III. Car Collection.**

Upon the entry of a Judgment for Dissolution of Marriage, Monica shall keep the car she presently drives, namely a purple 2010 Dodge Challenger, as her sole and separate property, free and clear of any interest or claim by James.

James shall keep the balance of the parties' classic car collection as his sole and separate property, namely:

(a) 1969 Camaro

(b) 1970 Caprice

(c) 1970 Roadrunner

(d) 2004 Suburban

(e) 2007 Escalade

***

**XII. Unallocated Items.**

Vanguard/Airline Miles

The parties have not come to an agreement regarding the balance of the Vanguard account, which is $20,193 ***. Monica should be allocated 100% of the remaining Vanguard funds as said funds are essentially the only available liquid marital asset to award to Monica. James' destruction and removal of property from the Mossville Storage Unit, which resulted in Monica seeking and obtaining a temporary restraining order and incurring legal fees provides additional grounds to award 100% of the Vanguard funds to Monica as well as the Airline Miles.

HELOC

The parties agree that Monica shall receive the Marital Residence subject to the mortgage, which shall be paid at the time the property is sold However, the parties have not allocated or agreed upon the allocation of the HELOC debt on the Marital Residence, which is roughly $200,000.

Monica's position is that 100% of the roughly $200,000 of HELOC debt should be allocated to James, who has an extremely high earning potential and is employed earning a substantial income ($257,800 of base pay per his employment contract, not inclusive of bonus, deferred compensation, tax-free reimbursements, and other fringe benefits). By contrast, Monica has virtually no earning potential nor prospects for viable employment income with which to pay this substantial debt."

¶ 17     On October 23, 2020, the trial court issued its Letter Opinion making the following relevant findings:

"5. The Court allocates the assets and debts as follows: [Monica] shall receive the marital residence (Peoria Heights residence) and sell same; [James] will be 100% responsible for the parties' $200,000 HELOC on the marital residence. [Monica] shall be solely responsible for her credit card debt ($22,176) and the $55,000 loan from her brother. [Monica] shall keep all her jewelry and [James] shall keep all his vehicles (Camaro, Caprice, Roadrunner, Suburban, Escalade). *** [James] shall keep the entire Vanguard account ***.

6. Maintenance is waived by [James]. However, [James] shall pay five (5) year reviewable maintenance in the amount of $5,000 per month, with true-ups as contemplated by the parties ***.

7. [James] shall pay $25,000 in legal fees to [Monica's legal counsel] within thirty (30) days and $2,500 in legal fees to [Monica's previous counsel] within thirty (30) days. [Monica] shall be responsible for the remainder of her attorney's fees.

8. A judgment of dissolution will be awarded to both parties."

As to Monica's dissipation claim, the trial court found as follows:

"In the instant matter, the Court finds that Monica has failed to establish a *prima facie* case for dissipation of marital assets. Monica contends that [James] withdrew the money from the 529 Plan without her knowledge or her consent. Initially, the Court finds that any ignorance to the parties' financial concerns was a result of her own willful ambivalence. Moreover, Monica did not meet her burden of establishing a preliminary showing of dissipation and her claims were simply speculative. First, the evidence regarding the cost of university tuition, room and board was unclear and confusing. The Court never received a specific cost of tuition, room and board for the parties' children. James testified that college for the triplets ranges between $150,000-$180,000 per year. Furthermore, the children had approximately $10,000 - $20,000 in scholarships per year. Monica's testimony was even less clear. She testified that James managed the parties' finances. She stated that she "was not involved in any aspects of [the parties'] finances." Her husband paid all the bills, the mortgage, property taxes, utilities and the children's school tuition and associated fees. As to the extent of the children's college expenses, Monica stated that James "managed the payments" and that he "didn't give specific information" about the extent of the children's scholarships.

No specific evidence was ever presented about the actual cost of tuition, room and board and fees for either Illinois Wesleyan or Bradley University. There were no bills

presented from any universities detailing the tuition, fees and costs that the parties incurred. Monica contends that James removed roughly $575,809 from the triplets' 529 accounts. The Court does not even know what the actual cost was for any of these schools. However, assuming James' accounting is correct, the tuition and fees for the children for four years ranged between $600,000 - $720,000 over four years. Even with scholarships ranging between $40,000 - $80,000 over that span, the parties would have spent approximately $520,000 on the low end for their children's college.

Monica contends that she was not aware of the rate at which marital finances were being depleted. However, there is no disputing that Monica was a willing participant in the spending-spree that the parties engaged in during the marriage, otherwise her contention that the parties had a lavish standard of living would be disingenuous. Moreover, Monica tacitly agreed to the spending-spree in which the parties mutually engaged. James was not the only party spending lavishly. There was no evidence that Monica objected to any of the college decisions that her children made, and the Court concludes that she agreed to the children going to these universities in advance of them attending schools in Illinois. Additionally, Monica was taking flights from Illinois to Texas to get her hair done. Monica contends that James dissipated over $500,000, but she was right along with him for the ride in depleting approximately $6.5 million of the other income that the parties had accumulated since 2006-07. Monica's dissipation claim appears to be the "ostrich" claim of dissipation: she puts her head in the sand and takes no accountability for knowing any of the parties' finances and without a clue of how the parties spent their money and now that the parties' marriage has broken down takes the position that nearly everything must

be on account of dissipation. This does not establish a *prima facie* case of dissipation in the Court's eyes.

Moreover, even if the Court were to determine that Monica had presented a modicum of proof to clear the low bar needed to establish a *prima facie* case (which the Court does not find), the Court would still find that James' expenditures were a family expense and were for necessary and appropriate purposes. More specifically, these expenses were not for his sole benefit but were for purposes related to the marriage and to the family as a whole. Initially, it must be noted that there never was an assertion that James was spending money on a paramour or that he had a drug or gambling problem. To the contrary, all the money that was being spent was withdrawn from a *joint checking account* which included monies from the 529 account. The Court is dubious that James was intending to dissipate monies from a shared account to which Monica had access. James is alleged to have raided a 529 college savings account. James testified that many of the withdrawals from the 529 account were for educational expenses for *their* children. Other monies were deposited into the children's debit account for spending money. He testified that he spent money at Autohaus for repairs for his daughter's VW Beetle automobile and his son's Mustang vehicle. Other monies were spent at Brush automotive for the parties' fleet of collector's vehicles. Monica even conceded on cross-examination that she did not object to these expenditures that James spent on the children. These parties spent money lavishly having both depleted nearly $7 million. This is not to contend that the parties spending was objectively reasonable, but for the parties it was reasonable (for them) and agreed to by both parties in advance. As previously stated, James does not have to account for every penny spent which would be nearly impossible to do, especially considering how

this couple depleted nearly $7 million between the two of them. The Court finds that Respondent's Exhibit 15 which outlined the parties' withdrawals from their joint checking account and was ultimately reconciled with their tax returns was an adequate summary of major expenditures of the parties' during the relevant period ***. Consequently, the Court finds that James demonstrated with clear and specific evidence how the funds were spent.

So, the Court finds that Monica did not establish a *prima facie* showing and. even if she did, James sufficiently demonstrated with clear and specific evidence how the funds were spent."

In finding that James would be responsible for a disproportionate share of the marital debt, the trial court made the following findings:

"Monica is 58 years of age with a heart condition. By no means is she elderly, but she has been out of the workforce forever having only worked two days in her life outside of a brief stint in a family business. She lacks any skills of any kind. Moreover, doctors have recommended that she not obtain stressful employment. On the other hand, James is 58 and is a trained CPA who is currently employed earning over $250,000 per year. James has successfully created and sold a multi-million-dollar business in the past and shows no signs that he could not achieve the same success in the future. Monica was the homemaker and James was the breadwinner. This factor dovetails nicely with the factor of whether a party has a reasonable opportunity for future acquisition of capital assets and income which greatly favors James. In addition, if we look at the lavish lifestyle that was established during the marriage (sizeable home, vacations, valuable automobile collections, jewelry), these parties lived high on the hog after the sale of a business by James *circa* 2006-07. Certainly, both parties need to curtail their spending and both parties cannot expect to

maintain the lifestyle to which they previously lived after they divorce. However, the standard of living established during the marriage may be an important factor, particularly in long marriages. This was a long marriage: approximately 29 years. Monica is never going to be able to independently earn sufficient income to equate to the standard of living during the marriage.

As all these factors demonstrate, James shall be responsible for a disproportionate share of the marital debt."

Regarding the distribution of debt related to attorneys fees, the trial court found as follows:

"James' income and earning potential far exceeds that of Monica and signals a need for a contribution by James. In conjunction with the Leveling of the Playing Field in Divorce Litigation Amendments, this Court finds that James shall contribute to Monica's legal fees. The Court hereby orders that James shall pay $25,000 to the law firm of MKFM within thirty (30) days. Furthermore, James will contribute $2,500 to Cheryl Berdelle within thirty (30) days. The Petitioner shall be responsible for her remaining attorney fees. On balance, Petitioner will then be responsible for $82,783.85 and Respondent shall be responsible for $80,500, which is nearly a 50/50 split on the remaining outstanding legal fees. In total, the Respondent will be responsible for $280,000 (attorneys fees and HELOC) of the parties remaining marital debt and Petitioner will be responsible for $159,959.85 of the parties' marital debt. This equates to Respondent being responsible for approximately 63% of the parties' marital debt. The Court did not receive accurate information as to the exact value of the marital home, the jewelry or cars. Therefore, the Court believes that this is the most equitable distribution in light of the evidence of available assets (with limited values assigned) and the assignment of debt, the parties' station in life, the standard of

living of the parties, the award of maintenance and the other factors of Section 503 and 504."

¶ 18    James submitted a proposed judgment for dissolution of marriage on December 8, 2020. On December 16, 2020, Monica filed objections to James' proposed judgment. Relevant here, she objected to (1) James' proposed maintenance being classified as "reviewable"; (2) no certain dollar amount capping James' maintenance obligations; (3) the amount earned by James over $257,800 based on net as opposed to gross income; (4) the proceeds of the sale of a Dodge Challenger being paid to James as the vehicle should be awarded as a gift to Monica; and (5) the jewelry included on the balance sheet instead of awarded as a gift to Monica.

¶ 19    On January 5, 2021, Monica filed a motion to reopen proofs, alleging that the September 17, 2020, bench trial "proceeded in a manner that was not approved or agreed to by Monica." She attached a September 11, 2020, letter from her previous counsel which stated, "that there would be no settlement and the case would be tried by the court because James was not willing to accept the Court's recommendations and Monica elected not to make a counter-offer." Monica also filed a motion for voluntary dismissal of the petition for dissolution of marriage on January 5, 2021, arguing that she "did not agree to the terms set forth in the Proffer of Settlement Terms" and again referenced the September 11, 2020, letter from her previous counsel.

¶ 20    On January 8, 2021, James filed an emergency motion for entry of judgment. The motion sought for the trial court to enter a judgment for dissolution based on either James' December 8, 2020, proposed judgment or the findings contained in the Letter Opinion. James subsequently filed his response to Monica's objections to proposed judgment, as well as a motion to strike Monica's motion to reopen proofs. Additionally, James filed a motion for sanctions pursuant to supreme court Rule 137.

¶ 21    On January 19, 2021, the trial court held a hearing on (1) Monica's motion for voluntary dismissal; (2) Monica's motion to reopen proof and James' motion to strike; (3) James' motion for sanctions; and (4) James' emergency motion for entry of judgment in conjunction with Monica's objections. As to Monica's motion for voluntary dismissal, the trial court denied the motion, stating that permitting such an action would lead to an "absurd and potentially deleterious result" as a petitioner could merely wait for a letter opinion and move to dismiss if the result is unfavorable. The trial court then granted James' motion to strike Monica's motion to reopen proofs, reasoning that reopening proofs was premature at that point as no judgment had yet been entered. The trial court did grant Monica leave to refile her motion to reopen proofs after the entry of judgment.

¶ 22    The trial court then moved to Monica's objections to James' proposed judgment. Beginning with Monica's objection to the trial court's characterization of the duration of maintenance in its Letter Opinion. After some back and forth between the parties' counsel and the establishment of the marriage's duration of 29 years, the following agreement was reached:

"THE COURT: All right. Here's *** the *** duration 29 years, however, it is reviewable after one. Do you understand why I'm doing that, because if I said indefinite, I think that contradicts the portion - - I have to categorize it first, right; Everyone agrees?

[JAMES' COUNSEL]: Yes.

THE COURT: If I call it indefinite and then I also call it reviewable, it creates a conflict.

[JAMES' COUNSEL]: Yep.

THE COURT: So, the duration would be 29 years because that's the length of the marriage but it's reviewable within a year.

[MONICA'S COUNSEL]: Five years as we said.

THE COURT: I'm sorry, what did - -

> [JAMES' COUNSEL]: The letter opinion said five years.
>
> THE COURT: I'm sorry, whatever it said."

Moving on to the amount of maintenance over James' base salary of $257,800, the trial court began by stating:

> "[T]his was a situation where the court held at least three pretrial conferences on this matter. What had occurred before the bench and that colloquy that was previously cited was essentially a finalization of one of the pretrials that we were having and that's the way the court took it to be."

The trial court then read into the record the exchange that occurred before the September 17, 2020, hearing between the parties' counsel and the trial court (see *supra* ¶ 6). The trial court then stated

> "That was a resolution. They were asking me, I gave a number, just as in a pretrial conference, and it was done at the bench. And that was the parties asking me to - - they were discussing these things and asking me to make a decision on it and they were, as they said, *** this was the way they were trying to streamline things.
>
> So *** the court's finding is going to be 27.5 percent of gross over 257,800.
>
> Now, I will note that this is supported in the record because no one presented any evidence or presented any testimony on this issue, so no one was trying to have me reserve the issue and then wait on it. This was done at the bench and the parties were accepting it. The stuff that they wanted litigated they brought before me and continued to argue it. No one even raised it, I don't believe, in a closing argument. So, again, that's the court's recollection of the facts of this case.
>
> ***

I've got to go from *** the way it was presented to me, and the way it was presented to me was, Judge, we're asking you to make this call on this because we don't want to have a trial on this, which is backed by the fact that no one presented any evidence on it.

And I said this is what I'm going to recommend at a pretrial conference, and this is what I'm going to have and no one - - I understand you're saying [James' counsel] was objecting to it. He wasn't; he was saying - - trying to make a record of the fact that - - I want to put on the record that I had - - they say this, I'm making the proper counter as in a counteroffer because he wanted to make his argument. And then just as he said *** they were going to present things and make an argument in order to save the litigants money, let me make the call on it essentially on the spot because it's a math problem. There wasn't going to be much more by way of evidence that they were going to submit and that's what my ruling was going to be.

So, again, it's 27.5 [percent] gross over [$]257,800."

¶ 23 The next issue visited was the cap on James' maintenance obligation. The trial court referenced an August 27, 2020, letter drafted by Monica's prior counsel that indicated the cap on maintenance was $7,000,000 based on discussions during a pretrial conference. The trial court remarked that it would revisit the issue. Following the hearing, the court entered an order that James' counsel would prepare revisions to the proposed judgment by January 21, 2022. The trial court would enter a judgment on January 26, 2022. James' motion for sanctions was denied.

¶ 24 James submitted his revised proposed judgment which detailed his maintenance obligations as follows:

"That by agreement of the parties, James's maintenance obligation is a slight upward deviation of maintenance from the statutory guidelines pursuant to Section 504.

That statutory maintenance pursuant to the statutory guidelines based on the *** current incomes of the parties is $4,768.17 per month. That James and Monica agree to the upward deviation of James' maintenance obligations to Monica ***.

That James' maintenance obligation is reviewable and modifiable. That the statutory duration of James' maintenance obligation is twenty-nine (29) years from February 1, 2021, subject to review following five years (60 months) following February 1, 2021, wherein the Court retains jurisdiction whether the maintenance should continue following the review period.

***

In the event that James receives any bonus, commission or other employment incentive income which are in excess of his base income of $257,800 per year, he shall "true up" his maintenance obligation to Monica commencing with a true up for the year of 2021 as defined as February 1, 2021, through December 31, 2021, and continuing thereafter subject to modifiability, the termination factors and the period of review herein ***. The subject of a cap on the true up has not been determined by the Court."

The revised proposed judgment continued to award the jewelry to Monica, acquired during the marriage. The Camaro, Caprice, Roadrunner, Suburban, and Escalade vehicles continued as awarded to James. Monica was to keep her new vehicle acquired after the sale of her Dodge Challenger.

¶ 25    On January 26, 2022, the trial court held another hearing to review and make further revisions to James' proposal before the entry of judgment for dissolution of marriage. The parties presented arguments on a cap to James' maintenance, ultimately agreeing that the trial court would

not impose a cap at that time. As to James' proposed judgment's silence on his maintenance obligations for income over his base salary, his counsel remarked

> "We can add in that in the event the James receives any bonus, commission, or other employment incentive income which are in excess of his base income of $257,800 per year, he shall true-up his maintenance obligation to Monica. And then we should add in the amount equal to 27.5 percent of his gross income over his base income."

The trial court and Monica's counsel agreed to the proposed language. Finally, the trial court elected to continue to award the vehicles and jewelry in the same manner as noted in its Letter Opinion and James' proposed judgment. Following the hearing, the trial court entered a judgment for dissolution of marriage, incorporating the revisions discussed above.

¶ 26    On February 23, 2021, James filed a motion to reconsider the judgment of dissolution and a motion to reopen proofs. The motion to reconsider argued that James' true up maintenance obligation based on a percentage of his gross income was impermissible as it deviated from statutory guidelines. The motion to reopen proofs was based on the issue of a cap on maintenance, arguing that no cap on maintenance could amount to an unfair windfall to Monica. Lastly, James' motion argued that the allocation of assets and debts, as well as a failure to allocate vehicles as agreed by the parties, was inequitable.

¶ 27    On February 25, 2021, Monica filed a motion to reconsider judgment of dissolution and motion to reopen the proofs. The motion to reconsider argued that the trial court erred in setting the true up maintenance provision on an annual basis. She also argued that it was error for the trial court to award to James 100% of the Vanguard account. Finally, she argued that the division of property and liabilities associated with the marital residence was made in error.

¶ 28    On June 14, 2021, the trial court denied the parties' post-trial motions "for all the reasons stated on the record."[3]

¶ 29    The parties then filed the appeals before us now.

¶ 30                                II. ANALYSIS

¶ 31    In this appeal, James contends that the trial court erred by (1) deviating from the guidelines in section 504(b-1)(1)(A) of the IMDMA in calculating his maintenance obligations above $257,800 on the basis of gross income; (2) imposing no limit or income cap upon which the 27.5% of gross income would be applied; and (3) allocating assets and debts in a manner inconsistent with the agreement of the parties. Monica's cross-appeal contends that the trial court erred awarding her reserved maintenance as opposed to indefinite maintenance. She also contends that the trial court erred in disallowing her claim of dissipation. We will begin our analysis with James' contentions.

¶ 32    James argues that a deviation from statutory guidelines was not permitted because the trial court failed to make a finding on whether an application of the guidelines would be inappropriate. Further, he argues that the trial court abused its discretion by never making a finding as to his income, making the maintenance award of 27.5% of gross income over $257,800 arbitrary.

¶ 33    We presume that a trial court's determinations in awarding maintenance and child support are correct, and we will not reverse its findings as to income or its awards unless the trial court abused its discretion. *In re Marriage of Lugge*, 2020 IL App (5th) 190046, ¶ 15. A ruling is an abuse of discretion where it is arbitrary, fanciful, or unreasonable, or where no reasonable person

_____

[3] No report of proceedings from the hearing on June 14, 2021, were provided in the record presented to this court.

would take the same view. *In re Marriage of Gabriel & Samoun*, 2020 IL App (1st) 182710, ¶ 39. Where a party challenges a trial court's factual findings for a maintenance determination, we will not reverse those findings unless they are against the manifest weight of the evidence, which occurs when the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Sturm*, 2020 IL App (4th) 110559, ¶ 3. A trial court may deviate from statutory maintenance guidelines based on a consideration of the same factors used to determine whether a maintenance award is appropriate in the first place. 750 ILCS 5/504(b-1)(1), (2), (b-2)(2) (West 2020).

¶ 34    James' arguments on his first contention are misleading as 504(b-1)(1)(A) of the IMDMA is inapplicable to the facts of this case. The trial court's maintenance award was not in accordance with the statutory guidelines and, as such, our analysis of that award is to be viewed under the strictures of section 504(b-1)(2). See 750 ILCS 5/504(b-1)(2) (West 2020).

¶ 35    Section 504(b-1) of the IMDMA provides

"Amount and duration of maintenance. Unless the court finds that a maintenance award is appropriate, it shall bar maintenance as to the party seeking maintenance regardless of the length of the marriage at the time the action was commenced. Only if the court finds that a maintenance award is appropriate, the court shall order guideline maintenance in accordance with paragraph (1) or non-guideline maintenance in accordance with paragraph (2) of this subsection (b-1)." 750 ILCS 5/504(b-1) (West 2020).

Section 504(b-1)(2) of the IMDMA provides

"Maintenance award not in accordance with guidelines. Any non-guidelines award of maintenance shall be made after the court's consideration of all relevant factors set forth in subsection (a) of this Section." 750 ILCS 5/504(b-1)(2) (West 2020).

Section 504(a) of the IMDMA provides

"(a) Entitlement to maintenance. In a proceeding for dissolution of marriage, legal separation, declaration of invalidity of marriage, or dissolution of a civil union, a proceeding for maintenance following a legal separation or dissolution of the marriage or civil union by a court which lacked personal jurisdiction over the absent spouse, a proceeding for modification of a previous order for maintenance under Section 510 of this Act, or any proceeding authorized under Section 501 of this Act, the court may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just, without regard to marital misconduct, and the maintenance may be paid from the income or property of the other spouse. The court shall first make a finding as to whether a maintenance award is appropriate, after consideration of all relevant factors, including:

(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2020).

Section 504(b-2) of the IMDMA provides

"Findings. In each case involving the issue of maintenance, the court shall make specific findings of fact, as follows:

(1) the court shall state its reasoning for awarding or not awarding maintenance and shall include references to each relevant factor set forth in subsection (a) of this Section;

(2) if the court deviates from applicable guidelines under paragraph (1) of subsection (b-1), it shall state in its findings the amount of maintenance (if determinable) or duration that would have been required under the guidelines and the reasoning for any variance from the guidelines; and

(3) the court shall state whether the maintenance is fixed-term, indefinite, reviewable, or reserved by the court." 750 ILCS 5/504(b-2) (West 2020).

¶ 36    The record supports the trial court's maintenance award based on the statutory scheme articulated above. In both its October 23, 2020, Letter Opinion, and judgment for dissolution of marriage, the trial court adhered to the IMDMA's requirements for non-guideline maintenance. The judgment for dissolution provides, in relevant part

"G. In arriving at the terms of this judgment, the Court has considered all of the factors set forth in the [IMDMA] under 750 ILCS 5/501 *et seq*., and the Court has had the opportunity to consider the evidence at trial which occurred on September 17, 2020, evidence proffered, and the demeanor and credibility of each party.

H. That the parties have agreed to certain terms which are contained herein as well as the Judge's ruling contained in a Letter Opinion dated October 23, 2020."

The trial court's Letter Opinion made all the requisite findings pursuant to section 504(a) of the IMDMA. See *supra* ¶ 17. Perhaps most importantly, the trial court's findings for its non-guideline maintenance award were based on the agreement of the parties. See *supra* ¶¶ 16, 17, 24. The agreements incorporated into the trial court's maintenance award findings clearly articulate what is required of section 504(b-2). See 750 ILCS 5/504(b-2) (West 2020).

¶ 37    The record further belies James' argument that he never agreed to the additional true-up of 27.5% of gross income over his base salary. He continuously directs this court to the exchange

before the September 17, 2020, bench trial between the parties' counsel and the trial court to support this assertion. See *supra* ¶ 6. If that were the only evidence of such an agreement, we may be inclined to agree with James. However, the proffer of settlement terms, the trial court's recognition of the parties' proffered maintenance agreement in its Letter Opinion, and James' counsel agreeing on the record to amend the proposed judgment to reflect that agreement, all refute James' attempt to blur the issue by limiting the discussion of this issue to only the September 17, 2020, colloquy.

¶ 38    Based on the foregoing, we hold that the trial court's non-guideline maintenance award was issued in harmony with the statutory requirements and the agreement of the parties as illustrated by the record presented to this court. We will not disturb the trial court's findings.

¶ 39    We now move on to James' contention that the trial court erred by imposing no cap on income upon which the 27.5% of gross income would be applied. He argues that the trial court had no evidence to determine that he was capable of earning gross income in excess of $257,800.

¶ 40    In his motion to reconsider the judgment for dissolution of marriage, James recounted that the trial court recommended an income cap on maintenance at the January 19, 2021, hearing, and that the parties had agreed that they would discuss the cap following the September 17, 2020, bench trial. James' motion to reconsider also mentioned that he had "financial documentation to present to the Court if proofs are reopened which were not presented *** at the time of trial[.]" However, James' motion to reconsider was denied by the trial court "for all the reasons stated on the record." James did not provide this court with a report of proceedings from the June 14, 2021, hearing on his motion to reconsider. Without such a record, this court has no basis to find any abuse of discretion by the trial court on this contention. When we do not know the basis of the court's ruling on a discretionary matter, we must presume that the order was in conformity with

the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 41    The evidence that was introduced to the trial court shows that the parties' annual income was far less than $500,000. James' employment agreement is in the record but was never admitted into evidence. The IMDMA provides an income cap on maintenance where the combined gross income of the parties is less than $500,000 annually. Section 504(b-1)(1)(A-1) states that "The [income] amount calculated as maintenance, *** when added to the gross income of the payee, may not result in the payee receiving an amount that is in excess of 40% of the combined gross income of the parties." 750 ILCS 504(b-1)(1)(A-1) (West 2020). In addition to his base salary of $257,800, the agreement shows that his bonus is targeted to reach 50% of his base salary. The agreement further accounts for Profit Interest Units beginning at 20% vesting and allowing a 5% fully diluted percentage interest in the company. James could have presented this agreement to the trial court at any time before judgment was entered. For whatever reason, the agreement does not appear in the record until it is included as an attachment to his motion to reconsider.

¶ 42    The trial court found that "James has successfully created and sold a multi-million-dollar business in the past and shows no signs that he could not achieve the same success in the future." The evidence in the record supports the trial court's finding as James earned over $7,000,000 in 2007, allowing the parties to enjoy a high standard of living during the subsequent years of their marriage. The record also shows that James' proposed judgment allowed for the annual true-up amount after the parties exchange financial documents. The income cap on James' maintenance obligations will be dictated by section 504(b-1)(1)(A-1) of the IMDMA as this court must presume that the trial court had a sufficient factual basis in decision to not impose a cap on income in its judgment for dissolution.

¶ 43    James' final contention in this appeal is that the trial court erred in the allocation of assets and debts, as well as failed to allocate vehicles as agreed by the parties. He argues that a financial affidavit attached to his motion to reconsider assigns values to the assets and liabilities, and shows that the trial court's award of property and assignment of debt is "overwhelmingly disproportionate" against him.

¶ 44    James again attempts to use attachments to his motion to reconsider as support for his argument on this issue. We must assume that the trial court properly considered the financial affidavit when allocating assets and denying James' motion to reconsider. See *Foutch* 99 Ill. 2d at 392. Based on the record presented, we can find no error with the trial court's allocation of the parties' assets and debts.

¶ 45    The touchstone of proper apportionment is whether it is equitable, and each case rests on its own facts. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 121. An equitable division does not necessarily mean an equal division, and one spouse may be awarded a larger share of the assets if the relevant factors warrant such a result. *Id.* "A reviewing court applies the manifest weight of the evidence standard to the factual findings of each factor on which a trial court may base its property disposition. *Id*. The division of the marital estate rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *In re Marriage of Winne*, 239 Ill. App. 3d 273, 280 (1993). The trial court's division of assets will only be disturbed when no reasonable person would take the view adopted by the trial court. *Id*.

¶ 46    The record shows that the parties agreed to limit the September 17, 2020, bench trial to the issues of debt and dissipation. In its Letter Opinion, the trial court allocated the assets and debts as follows:

> "[Monica] shall receive the marital residence (Peoria Heights residence) and sell same; [James] will be 100% responsible for the parties' $200,000 HELOC on the marital residence. [Monica] shall be solely responsible for her credit card debt ($22,176) and the $55,000 loan from her brother. [Monica] shall keep all her jewelry and [James] shall keep all his vehicles (Camaro, Caprice, Roadrunner, Suburban, Escalade). [James] shall keep the entire Vanguard account."

James' proposed judgment mirrors the above findings. It is true that no values are accounted for in James' proposed judgment regarding the jewelry and vehicles. But the distribution of those assets, as well as the assigned debts, was contemplated by the parties at every stage of the underlying litigation. The trial court's judgment for dissolution only further reflects the parties' continuous contemplation of that distribution. Further, the trial court's findings in its Letter Opinion were not against the manifest weight of the evidence. See *supra* ¶ 17. The trial court noted in its Letter Opinion that it "did not receive accurate information as to the exact value of the marital home, the jewelry or cars" before finding that it "believes that this is the most equitable distribution in light of the evidence of available assets (with limited values assigned) and the assignment of debt, the parties; station in life, the standard of living of the parties, the award of maintenance and other factors of Section 503 and 504." It is the parties' responsibility to present the trial court with sufficient evidence of the value of debts and assets. *In re Marriage of Smith*, 114 Ill. App. 3d 47, 54 (1983). Reviewing courts cannot reverse and remand dissolution cases where the parties had an adequate opportunity to introduce evidence but failed to do so. *Id*. Parties should not be allowed to benefit on review from their failure to introduce evidence at trial. *Id*. Based on the record before this court, we cannot hold that the trial court abused its discretion in the allocation of the parties' debts and assets.

¶ 47    We now turn to Monica's cross-appeal, beginning with her contention that the trial court erred by disallowing her claim of dissipation against James. She argues that her claim set forth a prima facie dissipation case, which James allegedly failed to rebut.

¶ 48    Dissipation is the use of marital assets for the benefit of one spouse for purposes unrelated to the marriage while the marriage is undergoing an irreconcilable breakdown. *In re Marriage of Holthaus*, 387 Ill. App. 3d 367, 374 (2008). The party alleging dissipation must first make a *prima facie* showing that dissipation has occurred. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 78. Once this showing has been made, however, the burden shifts to the party charged with dissipation to show with clear and specific evidence how the funds were spent. *Id*.

¶ 49    Whether a party's conduct constitutes dissipation depends on the facts and circumstances of the particular case. *Id*. Because dissipation is a factual inquiry, we will reverse the trial court's findings on the question only if they are against the manifest weight of the evidence. *Holthaus*, 387 Ill. App. 3d at 374. The court's findings are against the manifest weight of the evidence if the opposite conclusion is clearly apparent or if the findings are not based on the evidence. *Id*.

¶ 50    To present a *prima facie* case of dissipation, Section 503(d)(2) of the IMDMA provides as follows:

"(2) the dissipation by each party of the marital property, provided that a party's claim of dissipation is subject to the following conditions:

(i) a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later;

(ii) the notice of intent to claim dissipation shall contain, at a minimum, a date or period of time during which the marriage began undergoing an irretrievable

breakdown, an identification of the property dissipated, and a date or period of time during which the dissipation occurred;

(iii) a certificate or service of the notice of intent to claim dissipation shall be filed with the clerk of the court and be served pursuant to applicable rules;

(iv) no dissipation shall be deemed to have occurred prior to 3 years after the party claiming dissipation knew or should have known of the dissipation, but in no event prior to 5 years before the filing of the petition for dissolution of marriage[.]" 750 ILCS 503(d)(2) (West 2020).

A plaintiff presents a *prima facie* case where he or she presents some evidence on each element essential to the cause of action. *Romano*, 2012 IL App (2d) 091339, ¶ 100, citing *Minch v. George,* 395 Ill. App. 3d 390, 398, 335 (2009). Second, if the plaintiff has presented some evidence on each element, the court then must consider and weigh the totality of the evidence presented, including evidence that is favorable to the defendant.

¶ 51    We disagree with Monica's assertion that she presented a *prima facie* case of dissipation as she did not present evidence at the September 17, 2020, bench trial. During the bench trial, she did not provide any testimony regarding the date that the parties' marriage began to irretrievably breakdown. She did not introduce any evidence to support her claim of dissipation in the form of bank account statements or any other documents. It seems from her brief presented to this court that Monica believes that the mere allegation of dissipation is sufficient to present a *prima facie* case, so long as each of the elements in section 503(d)(2) of the IMDMA are listed in the notice.

¶ 52    Even if we were to agree with Monica that she presented some evidence on each of the elements in section 503(d)(2), the trial court gave detailed consideration to the totality of the evidence presented, virtually all of which was favorable to James. See *supra* ¶ 16. James testified

that the alleged withdrawals from the parties' 529 accounts were for legitimate family expenses. That testimony was supported by the exhibits introduced that showed the funds were deposited into the parties' joint checking account. Monica testified after reviewing James' exhibits that she could not determine whether any of the alleged withdrawals were for purposes other than legitimate family expenses. The trial court's denial of Monica's claim for dissipation was not against the manifest weight of the evidence.

¶ 53    We now come to Monica's final contention in this cross-appeal. She contends that the trial court erred by awarding her reserved maintenance, as opposed to indefinite maintenance after the parties' 29-year marriage. She argues that the trial court's classification of maintenance as "reviewable and modifiable" is an improper departure from the IMDMA.

¶ 54    A maintenance award provides the recipient the same standard of living after dissolution as the recipient enjoyed during the marriage. *In re Marriage of Brankin*, 2012 IL App (2d) 110203, ¶ 9. In determining whether to award or extend maintenance, a court must consider the parties' income, needs, future earning capacity, and standard of living during the marriage. 750 ILCS 5/504(a), 510(a-5) (West 2020). The court may also consider and require any other factor it deems "just and equitable." *Id.* § 504(a)(14). Given the variety of considerations and the need to tailor maintenance to the circumstances in each case, the court has wide discretion in determining whether maintenance is warranted. A court's maintenance determination will not be reversed absent an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 24.

¶ 55    Section 504(b-1)(B) of the IMDMA states that "[f]or a marriage of 20 or more years, the court, in its discretion, shall order maintenance for a period equal to the length of the marriage or for an indefinite term." 750 ILCS 5/504(b-1)(B) (West 2020). Section 504(b-2)(3) states that "the

court shall state whether the maintenance is fixed-term, indefinite, reviewable, or reserved by the court." 750 ILCS 504(b-2)(3) (West 2020).

¶ 56    The trial court's classification of James' maintenance obligations as "reviewable and modifiable" for "the statutory duration of *** twenty-nine (29) years *** subject to review following five years," was made in harmony with the requirements of the above sections of the IMDMA. Further, the parties agreed to the five-year reviewable maintenance award in the amount of $5,000 per month with contemplated annual true-ups in their proffer of settlement terms. Monica did object to the maintenance award being classified as "reviewable" in her objections to James' proposed judgement and argued during the January 19, 2021, hearing, that Monica had no ability to earn income close to James', and that it would be improper for her to have to come into court five years after judgment. Indeed, the trial court made findings as to Monica's dearth of future earning potential and James' ability to make a large amount of future income based on his entrepreneurial skills. James cites this court's opinion in *In re Marriage of Micheli*, 2014 IL App (2d) 121245, for support in his argument that "reviewable and modifiable" maintenance was properly awarded.

¶ 57    In *Micheli*, the respondent-husband was ordered by the trial court to pay temporary maintenance, reviewable after seven years, of $3,700 per month, plus 20% of gross future bonuses after child support was deducted. *Id*., ¶ 11. The trial court noted that the parties were married for 24 years, and both were 48 years old. *Id*. On appeal, the petitioner-wife contended that the maintenance award was an abuse of discretion, arguing that maintenance should have been permanent. This court disagreed, finding no abuse of discretion as the petitioner-wife was

"[a] college graduate who previously worked in the insurance industry. At the time of the dissolution, she was healthy, 48 years old, and employed full-time. Moreover, she

was awarded a substantial portion of the marital estate, which is a statutory factor tending to mitigate her need for maintenance. By denying permanent maintenance, the trial court implicitly determined that [petitioner-wife] had not shown that, after seven years, she would be employable only at an income substantially lower than the previous standard of living." *Id.*, ¶ 30.

¶ 58   *Micheli* is distinguishable from the case at bar. In the present case, the trial court's findings were detailed and undisputed as to Monica's ability to support herself in the future. At the time of dissolution, Monica was 58 years old. She had virtually no employment history and limited marketable skills. She suffers from a heart condition and is a breast cancer survivor. Her doctors recommended that she not obtain stressful employment. Monica was the homemaker during the marriage, raising the parties' children, while James was the sole breadwinner. James had "successfully created and sold a multi-million-dollar business in the past and shows no signs that he could not achieve the same success in the future."

¶ 59   Maintenance generally is intended to be rehabilitative to allow a dependent spouse to become financially independent, but permanent maintenance is appropriate where a spouse is unemployable or employable only at an income substantially lower than the previous standard of living. *In re Marriage of Heroy,* 385 Ill. App. 3d 640, 652 (2008). "A permanent maintenance award is justified where the spouse has employment skills but there is a discrepancy between her probable future income and the amount of income that would provide the standard of living she enjoyed while married." *Heroy,* 385 Ill. App. 3d at 652, quoting *In re Marriage of Selinger,* 351 Ill. App. 3d 611, 619 (2004). Permanent maintenance is generally considered appropriate in circumstances where a spouse has devoted significant time to raising a family in lieu of pursuing a career. *Heroy,* 385 Ill. App. 3d at 652.

¶ 60     The evidence presented in this case, as well as the trial court's findings, showed that an award of permanent maintenance to Monica was appropriate. As such, we hold that the trial court's classification of the maintenance award as "reviewable and modifiable" was an abuse of discretion. We remand the matter to the trial court to amend the judgment for dissolution of marriage in a manner consistent with this order.

¶ 61                                III. CONCLUSION

¶ 62     For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed in part, vacated in part, and the cause is remanded for further proceedings consistent with this order.

¶ 63     Affirmed in part. Vacated and remanded in part.